**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re | Chapter 11 |
| CORPORATE AIR, LLC, *et al.*, | Case No. 25-22602 (JCM) |
| Debtors.[1] | (Joint Administration Requested) |
| CORPORATE AIR, LLC, *et al.*, | |
| v. | |
| NO RESPONDENT | |

**DECLARATION OF DAVID NOLLETTI IN**
**SUPPORT OF FIRST DAY MOTIONS AND APPLICATIONS**

I, David Nolletti, hereby declare the following, under the penalty of perjury:

1.      I am the Chief Restructuring Officer ("CRO") of Corporate Air, LLC and certain

of its affiliated entities, each a debtor and debtor-in-possession (each, individually, a "Debtor" and,

collectively, the "Debtors") in the above-captioned chapter 11 cases.

2.      I have served as CRO of the Debtors since September 29, 2025 and, prior thereto,

provided financial advisory services to the Debtors since August 2025.  Through such capacities,

I am generally familiar with the Debtors' day-to-day operations, business and financial affairs,

and books and records.  I am above 18 years of age, and I am competent to testify.

3.      I am a Senior Managing Director in the firm's Restructuring & Turnaround Services

practice ("RTS") and the Aerospace, Defense, Aviation, & Space Practice Leader at Riveron

---

[1]      The Debtors in in chapter 11 cases, along with the last four digits of the Debtors' federal tax
identification numbers, are: Corporate Air, LLC (4224); Steel City Aviation, LLC; Cheyenne, LLC (0992); Pittsburgh
Flight Training Center, Inc. (8968); Steel City Aviation, Inc. (5763); CAM Investments, Inc. (3980); and Schreiner
Air Investments, LLC (8852). The location of Debtors' principal place of business and the Debtors' service address
in these chapter 11 cases is: 15 Allegheny County Airport, West Mifflin, PA 15122.

Document    Page 2 of 69

Management Services, LLC ("Riveron"). I have over twenty-five years of restructuring, corporate renewal, crisis management, and executive leadership experience acquired during my time serving as functional vice president, general manager, chief executive officer, board member, and chairman of applicable boards. As a result, I have developed extensive experience in sales, marketing, market research, business development, and operations, focusing on aerospace, defense, aviation, space, and general industrial verticals. I specialize in assisting debtors and creditors in aerospace manufacturing and aviation bankruptcy proceedings, and have been actively involved in leadership roles in the following representative restructuring matters: LATAM Airlines Group SA, RavnAir Alaska, Alatus Aerosystems, O'Gara Armoring, Odyssey Aircraft Engines, OneAviation, Eletson Holdings, Astra Space, and AeroCision.

4.      Prior to joining Riveron, I was the president, chief executive officer, and cofounder of Cold Mountain Capital LLC ("Cold Mountain"), a family front office private equity investment platform focused on acquiring and managing underperforming aerospace, defense, and heavy industrial manufacturing companies. Before Cold Mountain, I was a global marketing and market research manager at Procter & Gamble and served as a commissioned officer in the United States Army on both active duty and in the reserves. I earned my bachelor's degree in history and international relations from Lehigh University and my MBA from Xavier University. I hold a commercial pilots license with multiple jet type ratings and have more than 3,000 hours total flight time and I am a Certified Turnaround Professional ("CTP") and Certified Insolvency and Restructuring Advisor ("CIRA")

5.      Riveron RTS, LLC ("RTS") began advising the Debtors on or about August 21, 2025, as their financial advisor.  On September 29, 2025, RTS ended their engagement and executed a new engagement which provided for, among other things, my appointment as CRO.  In

my capacity as CRO, I am generally familiar with the Debtors' day-to-day operations, business, financial affairs, and books and records.

6.    I submit this declaration to assist this Court and parties in interest in understanding the circumstances leading to the commencement of these chapter 11 cases, the capital structure of the Debtors, the Debtors' prepetition debt facilities and the Debtors' prepetition restructuring efforts, and in support of: (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date"); and (b) the emergency "first day" relief that the Debtors have requested from the Court pursuant to the motions and applications described herein.

7.    This declaration is organized into five sections. Sections 1 and 2 describe the Debtors' history and operational and capital structure. Sections 3 and 4 detail the circumstances surrounding the commencement of these chapter 11 cases and the Debtors' objectives with respect to the chapter 11 cases. Section 5 sets forth the evidentiary basis for the relief requested in each of the pleadings filed in connection with these chapter 11 cases.

8.    Except as otherwise indicated herein, all facts set forth in this declaration are based on my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors, and my review of the relevant documents and information concerning the Debtors' operations, financial affairs, and refinancing and restructuring initiatives. If called upon to testify, I could and would testify competently to the facts set forth herein.

## I.    Background – The Debtors' History and Operations

9.    The Debtors are a fixed base operator ("FBO") located at the Allegheny County Airport (AGC) serving both general and business aviation clients across the region. The Debtors provide a comprehensive suite of aviation services, including aircraft management and charter operations, hangar rental, fuel services, maintenance, and flight training. They serve as a central

11731219.v5

aviation hub for the surrounding region, supporting transient and locally based aircraft, fostering new pilot development, and delivering high-quality, on-demand air transportation through their charter service.

10.    The Debtors offer hangar and ramp services, which provides both short-term and long-term storage for aircraft of various sizes.  The Debtors also offer tiedown space.  The Debtors provide convenient fueling operations and supply both JetA and 100LL avgas.  The Debtors also provide full-service aircraft maintenance services for scheduled and unscheduled maintenance. The Debtors also provide flight training services through their experienced instructors.

11.    The Debtors main business was started in 1986 when Mark Schreiner ("Mr. Schreiner"), who operated a flight school at the time, acquired the assets of Page AvJet, thus entering the aircraft management business.   Since that time, the business grew through both acquisitions and organic growth.  Aircraft were added for Allegheny General Hospital as well as other Pittsburgh companies.   In 1995 Corporate Air purchased the fueling division and two hangars, which is the primary location for the FBO, from Corporate Jets. This made Corporate Air the sole fuel provider at the Allegheny County Airport.

12.    The Debtors experienced a significant expansion around 1998 resulting from an agreement with Executive Jet Management ("EJM"), a NetJets Company, to provide supplemental lift for its charter division.  In 1999, the Debtors expanded their aircraft management business by acquiring the flight department assets of Westinghouse Electric.   The arrangement allowed the Debtors to perform all of Westinghouse's aviation services, including a daily shuttle between Pittsburgh, PA and Bradley, CT.   The Debtors contemporaneously won a bid to manage CONSOL Energy's flight department which resulted in the addition of a facility and a Gulfstream II-SP.  The Debtors continued their expansion with agreements with Marconi Communications and the

11731219.v5

acquisition of its first Gulfstream IV-SP.   This was operated successfully for two years until Marconi Communications was forced to sell its aircraft due to a downturn in the telecommunications industry.

13.    In 1999 Corporate Air merged with two other charter operators, Davis Air and Tyburn Aviation, to form United Air Group (which now operates as Corporate Air, LLC).

14.    The Debtors began a relationship with Dick's Sporting Goods (DSG) in the summer of 2001.   The Debtors provided charter services to DSG and DSG acquired a Gulfstream IV-SP and entered into a long-term lease of a Cessna Citation X.   These aircraft were utilized for DSG transportation but also in the Debtors charter pool, which provided significant revenue to both the Debtors and DSG.   DSG also added a Gulfstream 550, which the Debtors were able to use in their charter fleet.   Over the course of the relationship with DSG, DSG purchased and sold 20 various types of aircraft, all of which Corporate Air managed, chartered, and provided fuel and maintenance services.

15.    In 2003, the Debtors entered into a relationship with a real estate developer in St. Maarten that allowed them to acquire an additional Gulfstream IV-SP.   The Debtors operations peaked in or around 2015 with approximately 20 managed aircraft.

16.    The Debtors are currently comprised of seven entities, all ultimately held by Mr. Schreiner, with the exception of Schreiner Air Investments, LLC ("Schreiner Air"), of which Laura Schreiner owns a 50% interest.   Mr. Schreiner owns 100% of CAM Investments, Cheyenne, LLC, Steel City Aviation, Inc., d/b/a  Pittsburgh Flight Training Center, Inc. ("PFTC"), and Steel City Aviation, LLC.   CAM Investments holds 100% of PFTC and Corporate Air, LLC ("Corporate Air").   An organizational chart for the Debtors is attached hereto as **Exhibit A**.

17.     CAM Investments owns the buildings at the airport and is the party to the lease with Allegheny County for the airport operations.   The overwhelming majority of operations occurring within two entities – Corporate Air and PFTC.   Corporate Air provides the aircraft charter services, hangar rental, fuel services, and maintenance functions for the Debtors.   Corporate Air holds the FAA Part 135 certificate that allows for charter operations.   PFTC provides the flight training operations.   PFTC owns a flight simulator and the furniture in the building.

18.     The remaining entities are utilized for special purposes.   Schreiner Air owns an aircraft that it leases to Corporate Air for use in charter services.   Cheyenne, LLC owns aircraft utilized by PFTC in the flight school operations.   Steel City Aviation, Inc. holds the FAA Part 141 certificate that allows PFTC to perform flight training.   Steel City Aviation, LLC was formed as an entity but never utilized and does not have any operations.   Steel City Aviation, LLC has not applied for an Employer Identification Number from the IRS.

## II.     Capital Structure and Pre-Petition Obligations

19.     The Debtors significant pre-petition obligations are comprised of (i) secured debt obligations to Huntington National Bank ("HNB"); (ii) secured debt obligations to the United States Small Business Administration (the "SBA"); (iii) secured debt obligations to Vantage AGC, LLC ("Vantage"); (iv) unsecured debt related to various litigations; and (v) trade debt.

### A.     HNB Secured Debt

20.     On December 14, 2020, HNB as lender, and CAM Investments, Inc. and Corporate Air, LLC and other loan parties from time to time parties thereto, which includes each of the Debtors as borrowers, entered into that certain MSPLF Credit Agreement (as amended, modified, restated, or supplemented from time to time the "HNB  Loan Agreement"), and, collectively with all documents, notes, security agreements, mortgages, guarantees, subordination agreements, deeds, instruments, indemnities, indemnity letters, fee letters, assignments, charges, amendments,

and any other agreements delivered pursuant thereto or in connection therewith, the "Huntington Loan Documents"). Pursuant to the Huntington Loan Agreement, Huntington agreed to extend a term loan to the Borrowers in the original principal amount of $10 million.

21.    As of the Petition Date, the principal amount outstanding under the Huntington Loan Documents was approximately $2,575,054 on account of the advances under the HNB Loan Agreement, plus accrued and unpaid interest, fees, expenses (including professional fees), disbursements, charges, claims, indemnities, and other costs and obligations (the "HNB Obligations").

22.    The HNB Obligations are secured by valid, perfected, binding, enforceable, and nonavoidable first priority liens and security interests (the "HNB Liens") in all prepetition and postpetition real property and all prepetition and postpetition tangible and intangible personal property of the Debtors, on all of the Debtors' assets other than the assets of Corporate Air, which liens are subordinated and junior solely to the SBA Liens (as defined herein).

**B.    SBA Secured Debt**

23.    On April 20, 2020, the SBA as lender, and Corporate Air, LLC as borrower, entered into that certain United States Small Business Administration Economic Injury Disaster Loan, No. 3243527202 (as amended, modified, restated, or supplemented from time to time the "SBA Loan Agreement", and, collectively with all documents, notes, security agreements, mortgages, guarantees, subordination agreements, deeds, instruments, indemnities, indemnity letters, fee letters, assignments, charges, amendments, and any other agreements delivered pursuant thereto or in connection therewith, the "SBA Loan Documents"). Pursuant to the SBA  Loan Agreement, SBA made certain advances to Corporate Air in the original principal amount of $500,000.

24.    As of the Petition Date, the principal amount outstanding under the SBA Loan Documents was approximately $472,934 on account of the advances under the SBA Loan Agreement,

11731219.v5

plus accrued and unpaid interest, fees, expenses (including professional fees), disbursements, charges, claims, indemnities, and other costs and obligations (the "SBA Obligations").

25.    The SBA Obligations are secured by valid, perfected, binding, enforceable, and nonavoidable first priority liens and security interests (the "SBA Liens") in all prepetition and postpetition real property and all prepetition and postpetition tangible and intangible personal property of Corporate Air.

### C.    Prepetition Bridge Loans

26.    The Debtors are party to that certain Secured Promissory Note, dated August 26, 2025 (the "Prepetition Bridge Note", with any advances made pursuant to the Prepetition Bridge Note being the "Prepetition Bridge Loan"), by the Debtors in favor of Vantage, pursuant to which Vantage made certain advances to the Debtors prior to the Petition Date.

27.    As of the Petition Date, the Debtors were justly and lawfully indebted and liable to Vantage, without defense, counterclaim, or offset of any kind, in an aggregate principal amount of $2,000,000 on account of the Prepetition Bridge Loan, plus accrued and unpaid interest, fees, expenses (including professional fees), disbursements, charges, claims, indemnities, and other costs and obligations (the "Prepetition Bridge Loan Obligations")

28.    The Prepetition Bridge Loan Obligations are secured by valid, perfected, binding, enforceable, and nonavoidable liens and security interests (the "Prepetition Bridge Liens") in all prepetition and postpetition real property and all prepetition and postpetition tangible and intangible personal property of the Debtors, whether tangible or intangible, wheresoever located, and whether now owned or hereafter acquired and whether now existing or hereafter coming into existence, including, but not limited to, all accounts, causes of action, claims, commercial tort claims, contracts rights, chattel paper, cash, general intangibles, insurance policies and rights, intellectual property, machinery, equipment, goods, inventory, furniture, fixtures, letter of credit

8

rights, books and records, deposit accounts, documents, instruments, and rents, together with all proceeds of each of the foregoing, including insurance proceeds (as each such term above is defined in the UCC, to the extent applicable).

### D.    Litigation Debt

29.    The Debtors have been involved in certain litigations for which a judgment has been entered against the Debtors. The most significant judgments are: (i) Signature Energy judgment in the amount of $997,680,86 (the "Signature Judgment"); (ii) Francois Bitz judgment in the amount of $3,441,003 (the "Bitz Judgement"); (iii) American Express judgment in the amount of $544,072.75 (the "Amex Judgment"); and (iv) 84 Lumber Company judgment in the amount of $461,966 (the "84 Judgment," collectively with the Signature Judgement, the Bitz Judgment, and the Amex Judgment, the "Judgments"). The Debtors reserve all rights with respect to these Judgments. 84 Lumber has garnished a bank account at HNB as a result of the 84 Judgment.

### E.    Trade Debt

30.    As of the Petition Date, the Debtors estimate that they owe approximately $3.6 million to vendors and other parties for trade debt, exclusive of the Litigation Debt.

## III.    Circumstances Leading to Chapter 11 Filing

31.    The Debtors business peaked in 2015 with approximately 20 aircraft. Like many independent FBOs, the Debtors were sensitive not only to challenges in their own industry, but challenges in their customers' industries. In situations such as Marconi Communications, when a customer's business suffers, they reduce or remove their reliance on private aviation thus impacting the Debtors' business. These impacts are compounded by the fact that the Debtors utilize the aircraft of their customers in their charter fleet and perform maintenance and fueling services for such aircraft. Therefore, the loss of a customer impacts the Debtors' direct revenue

from that customer as well as the revenue that can be generated using the that customer's aircraft for other customers, as well as decreased fuel and maintenance revenues.

32.     The Debtors' business is also sensitive to customer concentration.    In the build up to the Debtors' peak operations, DSG was responsible for approximately half of the Debtors' revenue.    In June of 2023, DSG pulled its business from the Debtors, including five aircraft, and hired certain pilots and crew members from the Debtors.    The Debtors asserted that DSG could not remove the business and take the pilots and crew members due to, among other things, non-compete agreements with the pilots.    The Debtors and DSG ultimately resolved their differences, with DSG paying approximately $4 million to the Debtors as a settlement.    However, the reduction of this business started a spiral of liquidity issues.

33.     The loss of the DSG business reduced both the Debtors' revenue from DSG and the Debtors' ability to produce revenue using the DSG aircraft for other charter clients.    With the loss of the DSG business, the Debtors had liquidity constraints that made it difficult for them to service their debt load.    In 2024, the Debtors lost two additional managed aircraft contracts, and in 2025 they lost a third, the losses of which directly impacted the charter, fuel sales and maintenance revenues.    As a result, the Debtors were forced to sell certain assets to maintain liquidity, including certain aircrafts and a hanger.

34.     By August of 2025, the Debtors' liquidity situation was dire.    The lack of liquidity prevented the Debtors from implementing process improvements and gathering additional customers.    Moreover, the Debtors lack of viable assets further impaired their ability to service additional customers if they were obtained.

35.     In an effort to combat such challenges and improve liquidity, prior to the Petition Date, the Debtors, among other things, engaged professional advisors to assist with liquidity,

11731219.v5

financial, operational, and strategic planning issues and actively engaged with potential financial parties to obtain additional needed liquidity.   Notwithstanding these efforts, the Debtors determine that the continued operation of their business was unsustainable without an actionable transaction. In fact, prior to the Petition Date, the Debtors' ground leases were at risk of being terminated by Allegheny County Airport Authority (the "Airport Authority"), the landlord, due to a variety of defaults.   Termination of the ground leases would have had a catastrophic effect on the Debtors' business, including the loss of jobs and substantial value degradation.

36.      As a result, and faced with the inability to service their debts, the Debtors entered into discussions with Vantage regarding management assistance and financing.   On August 26, 2025, the Debtors and Vantage entered into a management services agreement ("MSA") that provided assistance in managing the day-to-day operations of the Debtors.   In connection with the MSA, the Debtors and Vantage entered into the Prepetition Bridge Note to provide the financing necessary to preserve the value of the Debtors' assets and to bridge to a restructuring process that could preserve the Debtors' business as a going concern.   Critically, this allowed the Debtors to avoid the termination of their ground leases. This process also resulted in the preparation and execution of a restructuring support agreement between the Debtors and Vantage (the "RSA") whereby, among other things, Vantage will acquire substantially all of the Debtors' assets pursuant to a chapter 11 plan (the "Plan").   The RSA is attached hereto as **Exhibit B**.

## IV.    Objectives of Chapter 11 Filing

37.      As discussed herein, prior to the MSA and Prepetition Bridge Note, the Debtors' assets were imperiled due to their severe liquidity crisis.   The bridge financing provided by Vantage has allowed the Debtors to stabilize their operations and preserve their assets in the short term, as well as to pursue a value maximizing going concern transaction with Vantage.   Without the emergency support and financing provided by Vantage, the Debtors' operations would have

11

been shuttered, employees would have lost their employment, and creditors would be relegated to nominal recoveries, if any.

38.     The Debtors filed these chapter 11 cases to effectuate the sale of substantially all of their assets to Vantage pursuant to the Plan, as set forth in the RSA and that certain Asset Purchase Agreement dated as of September 12, 2025 by and amoung the Debtors and Vantage (the "APA"). In furtherance of the RSA and the APA, on September 19, 2025, the Airport Authority approved an assignment of the Debtors' ground leases to Vantage.

39.     The transactions contemplated by the RSA will, among other things, satisfy the HNB and SBA secured debt in full, satisfy priority claims in full, preserve the employment of the Debtors employees, transition the Debtors' business to experienced and well-capitalized operators, and allow the Debtors operations to continue to the benefit of their customers and vendors.  In order to consummate the transactions set forth in the RSA and the Plan, the Debtors have obtained junior debtor-in-possession financing from Vantage.

40.     The Debtors' financial circumstances are urgent, and time is of the essence with respect to the transactions contemplated by the RSA. The Debtors thus seek to act quickly in these chapter 11 cases to preserve the value of their assets for the benefits of their estates, creditors, and other parties-in-interest, including the Airport Authority and Allegheny County.

11731219.v5

V.      **First Day Motions**

41.      The Debtors have filed or will file a number of "first day" and "second day" motions seeking orders granting various forms of relief. I believe the forms of relief requested are necessary to enable the Debtors to operate with minimal disruption during the pendency of the chapter 11 cases and to ensure the best outcome for the Debtors, their estates, their creditors, and all other parties in interest. A description of the relief requested and the facts supporting each of the first day motions is set forth below.

A.      **Motion for Joint Administration**

42.      Pursuant to the *Debtors' Emergency Motion for Entry of an Order Directing the Joint Administrative of the Debtors' Chapter 11 Cases* (the "Joint Administration Motion"), the Debtors seek the entry of an order (a) authorizing the consolidation and joint administration of the Debtors' chapter 11 cases, for procedural purposes only, and (b) directing parties in interest to use a consolidated caption indicating that any pleading they file relates to the jointly administered bankruptcy cases of "Corporate Air, LLC, *et al.*" Many of the motions, hearings and other matters involved in the chapter 11 cases will affect all of the Debtors, and joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications and orders, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates. Accordingly, I believe the Court should approve the joint administration of these chapter 11 cases and grant the Joint Administration Motion.

B.      **Matrix Consolidation Motion**

43.      Pursuant to the *Debtors' Emergency Motion for an Order Authorizing the Debtors to File a Consolidated Creditor Matrix and a Consolidated List of the Debtors' 30 Largest Unsecured Creditors* (the "Matrix Consolidation Motion"), the Debtors seek entry of an order (i) authorizing the Debtors to file a consolidated list of creditors (the "Creditor Matrix")

and (ii) authorizing the Debtors to file a consolidated list of the Debtors' 30 largest unsecured creditors.

44.     Given the affiliated nature of the Debtors, the Debtors submit that permitting them to maintain a single consolidated Creditor Matrix, in lieu of filing a separate creditor matrix for each Debtor, is warranted.  Segregating the Debtors' records to a specific creditor matrix format, in particular given the size and scope of these chapter 11 cases and the number of the Debtors' creditors, would be an unnecessarily burdensome task and would serve no practical purpose. Indeed, because many creditors are creditors of more than one Debtor, failure to maintain a single consolidated Creditor Matrix would result in duplicate mailings.  In addition, filing a single consolidated Creditor Matrix would facilitate the U.S. Trustee's review of creditors' claims and its appointment of a single creditors' committee in these cases.  Based on the foregoing, in the absence of any corresponding benefit, the Debtors request authority to file the consolidated Creditor Matrix in lieu of filing separate lists for each Debtor.  I believe that such relief is appropriate under the circumstances for the efficient and orderly administration of these cases.

45.     Similarly, by the Matrix Consolidation Motion, the Debtors respectfully request authority to file a single consolidated list of their 30 largest general unsecured creditors (the "Top Creditor List").  As explained above, a large number of creditors are shared amongst the Debtors. Therefore, the Top Creditor List will help alleviate administrative burdens, costs and the possibility of duplicative service, and facilitate the U.S. Trustee's appointment of a committee in these cases.

### C.     Claims and Noticing Agent Retention

46.     Pursuant to the *Application of Debtors for Order Appointing Omni Agent Solutions, Inc. as Claims and Noticing Agent Under 28 U.S.C. § 156(c), 11 U.S.C. § 105(a), and W. PA. LBR 1002-8, Effective as of the Petition Date* (the "Claims Agent Application"), the Debtors seek the entry of an order appointing Omni Agent Solutions, Inc. ("Omni") as the Claims and Noticing

2

11731222.v4

Agent for the Debtors and their chapter 11 cases, including assuming full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Debtors' chapter 11 cases. Prior to selecting Omni to act as the Claims and Noticing Agent, the Debtors obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agents to ensure selection through a competitive process. Based on all engagement proposals obtained and reviewed, I believe that Omni's rates are competitive and reasonable given Omni's quality of services and expertise. The terms of Omni's retention are set forth in the Engagement Agreement attached to the Claims Agent Application as Exhibit C.

47.     Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be thousands of entities to be noticed in these cases.  In view of the number of anticipated claimants and the complexity of the Debtors' businesses, I submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Office of the Clerk of the Bankruptcy Court of the administrative burden of, noticing, administering claims, and soliciting and balloting votes, and is in the best interests of both the Debtors' estates and their creditors. Accordingly, I believe that appointing Omni as the claims and noticing agent in these chapter 11 cases will maximize the value of the Debtors' estates for all of their stakeholders.

### D.     Case Management Procedures Motion

48.     By the *Debtors' Emergency Motion for an Order Establishing Certain Notice, Case Management and Administrative Procedures, Including Omnibus Hearing Dates and Times* (the "Case Management Motion"), the Debtors seek to establish certain case management procedures that will apply to these chapter 11 cases, including a master service list. By approving and implementing certain case management procedures and approving a service list, the Debtors believe that the administration of these cases will be streamlined and the burden upon the Court

11731222.v4

will be reduced. As set forth in the Case Management Motion, the Debtors have used Local Form

58 as the baseline for the proposed order approving the motion. To assist the Court and parties in

interest with evaluating the proposed order, attached to the Case Management Motion is a redline

reflecting the differences between the proposed order and Local Form 58.

### E.    DIP Financing and Cash Collateral Motions

49.    As noted above, the Debtors are in a dire liquidity crunch.  The use of cash collateral

and incremental liquidity in the form of postpetition financing is critical for the Debtors to preserve

and maximize the value of their estates for the benefit of all parties in interest.  In anticipation of

this need, the Debtors engaged professional advisors to assist with liquidity, financial, operational

and strategic planning issues.  To that end, the Debtors and their professionals communicated with,

among other parties, Vantage, about providing DIP financing, including on a junior basis.

50.    Following extensive good faith, arms' length negotiations with Vantage, and

subject to Court approval, the Debtors entered into a DIP Credit Agreement (as the same may be

amended, restated, supplemented, waived or otherwise modified from time to time, the "DIP Credit

Agreement") with Vantage (in such capacity, the "DIP Lender") to provide junior DIP financing

for these chapter 11 cases.  Accordingly, the Debtors have filed an Emergency Motion for *Interim*

*and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting*

*Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Authorizing*

*the Use of Cash Collateral and Granting Adequate Protection, (IV) Modifying the Automatic Stay;*

*and (IV) Granting Related Relief* (the "DIP/Cash Collateral Motion") contemporaneously

herewith.

51.    By the DIP/Cash Collateral Motion, the Debtors seek the entry of interim and final

orders authorizing, *inter alia*, the Debtors to obtain new money term loan commitments in the

aggregate maximum principal amount of up to $4.5 million, of which $1.5 million will be available

4

upon the entry of the Interim Order, subject to the terms and conditions of the Interim Order and the DIP Credit Agreement. The DIP loan would be secured by (i) valid, binding, and fully perfected first priority liens on any unencumbered property, (ii) valid, binding, and fully perfected priming liens solely of the Prepetition Bridge Liens (on a consensual basis) and not priming of the HNB Liens or SBA Liens, and (iii) valid, binding, and fully perfected junior DIP Liens that are subject and subordinated only to the Carve Out, the Prepetition Senior Secured Liens, and the Adequate Protection Liens, as more fully set forth in the DIP/Cash Collateral Motion and DIP Credit Agreement. In addition, by the DIP/Cash Collateral Motion, subject to the terms and conditions described therein, the Debtors seek authority to use cash collateral in accordance with the Approved Budget, and to provide adequate protection to their Prepetition Secured Parties (as defined in the DIP/Cash Collateral Motion) in exchange for such use, among other relief.

52.    The Debtors have closely scrutinized the financing terms offered by the DIP Lender, including the economic terms, the impact on the Debtors' businesses, any restrictions on the use of proceeds and the collateral and security requested, and I believe that the terms sought to be approved by the DIP/Cash Collateral Motion are necessary and appropriate. Additionally, the DIP Lender is familiar with the Debtors, their businesses, and their capital structure. This familiarity has enabled the parties to act more quickly and limit diligence risk, both of which are crucial in light the Debtors' critical need for liquidity.

53.    I am familiar with the material terms of the DIP Facility and the liens, claims, and adequate protection to be provided thereunder. Based on my experience in the restructuring industry generally, and with the Debtors specifically, I believe that approval of the DIP Facility consisting of new money term loan commitments in the aggregate maximum principal amount of up to $4.5 million, of with $1.5 million will be available upon entry of the Interim Order, and (i)

approval of the use of cash collateral, and (ii) granting of DIP liens, DIP claims, and adequate protection liens and claims, each as more fully set forth in the DIP/Cash Collateral Motion, is critical to preserving and maximizing the value of the Debtors' estates.

54.    As noted above, the Debtors require immediate access to liquidity to ensure that they can continue operating their businesses during these chapter 11 cases, preserve the value of their estates for the benefit of all parties in interest, confirm the Plan, and effectuate the restructuring transactions set forth therein.  Absent funds available from the DIP Facility, access to cash collateral, and the cooperation of key business partners at this critical early stage, the Debtors could face a value-destructive interruption to their businesses and lose support from parties on whom the Debtors' businesses depend.  Such an outcome would hinder the Debtors' ability to maximize the value of their estates, and would force them to shut down operations to the serious detriment of the Debtors, their estates, and their creditors.  Put simply, without access to cash collateral and the funds to be advanced via the proposed DIP Loan, the Debtors will not have sufficient operating cash flow in the ordinary course of business to satisfy both their operating costs going forward and the projected restructuring costs of these Chapter 11 Cases.

55.    The Debtors made a good faith effort to obtain postpetition credit without the protections afforded under the DIP/Cash Collateral Motion, but have not been able to identify an alternative DIP loan, let alone one on a junior basis.  The Debtors communicated with at least four other potential third-party lenders about their willingness to provide financing, including financing on a junior basis. However, none of these parties were willing to provide financing on an unsecured, non-superpriority or junior basis, particularly in light of the challenges facing the Debtors, the lack of any unencumbered assets, and the existing capital structure.  Further, given the unwillingness of the existing secured lenders to subordinate to new incremental financing, it

6

11731222.v4

would be unrealistic to conduct an exhaustive search for such financing. Additionally, with any third-party proposal, the Debtors would incur the execution risk associated with a priming lender transaction, including material timing and due diligence constraints, necessarily involving the payment of additional professional fees.  In contrast, the proposed junior DIP Facility offered by the DIP Lender allows the Debtors to avoid the need to engage in a costly and time-consuming priming fight at the outset of these Chapter 11 Cases.

56.    I understand that the Debtors have agreed, subject to Court approval, to pay certain costs, fees, and expenses to the DIP Agent and the DIP Lenders pursuant to the DIP Credit Agreement.  Specifically, the Debtors have agreed to (i) pay a closing fee of 2% upon closing of the DIP Facility (which fee will be paid over time); and (ii) accrue monthly in arrears and pay 15% interest on amounts advanced under the DIP Facility; and (iii) pay costs and expenses of the DIP Lender, including attorneys' fees and costs. Based on my experience, and under the facts of these cases, including the fact that the proposed DIP Facility is a subordinated loan, these types of fees, interest and costs are reasonable, customary, and appropriate under the circumstances.

57.    The DIP Credit Agreement contains certain milestones (the "Milestones") that the Debtors must meet during their Chapter 11 Cases.  Failure to meet the Milestones constitutes an event of default under the DIP Credit Agreement.  The Milestones were negotiated and required by the DIP Lender as a condition to the DIP Facility, and were agreed to by the Debtors in their negotiation of the DIP loan and the RSA.  I have reviewed these Milestones, and I believe that they are fair, appropriate, and achievable in light of the chapter 11 plan process the Debtors propose to undertake in the very near term.

58.    I believe that the filing of these chapter 11 cases and the incurrence of indebtedness under the DIP Loan offers the best available option for the Debtors, as they provide the necessary

liquidity for the Debtors to confirm the Plan, which will deleverage the Debtors' balance sheet and transition their facilities to new operators in an orderly fashion, with minimal disruption to customers. I also believe that the terms of the DIP Loan and the terms governing the Debtors' use of cash collateral were heavily negotiated in good faith, and at arm's length, and that the terms upon which the parties ultimately agreed are the most favorable terms the Debtors could have achieved under the circumstances. For these reasons, I submit that the relief sought in the DIP/Cash Collateral Motion is in the best interests of the Debtors' estates and should be approved.

59.     I believe that approval of the DIP Facility and use of Cash Collateral is critical to assuring parties in interest of the Debtors' ability to maintain and consummate a transfer of their operations through a Plan. The Debtors have pledged all of their assets as collateral under the HNB Obligations, SBA Obligations, and Prepetition Bridge Loan Obligations. Consequently, the only available financing is via the junior DIP Facility contemplated herein.

60.     I believe the DIP Facility provides the Debtors with the liquidity they need to administer the Chapter 11 Cases and consummate a successful Plan in accordance with the RSA, and the Debtors have concluded that the DIP Facility represents the Debtors' best (and only) available post-petition financing option.

**F.     Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees, and (II) Granting Related Relief**

61.     By the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees, and (II) Granting Related Relief* (the "Tax Motion"), the Debtors seek the entry of interim and final orders (i) authorizing, but not directing, the Debtors to remit and pay certain prepetition taxes and fees that will become payable during the pendency of these chapter 11 cases in the ordinary course of business, in an aggregate amount not

11731222.v4

to exceed $22,500 on an interim basis and an amount to be determined on a final basis, and (ii) granting related relief.

62.    In the ordinary course of their businesses, the Debtors collect and incur sales, use, custom taxes, business and mercantile taxes, and excise taxes (collectively, the "Taxes and Fees"), which are comprise of: (a) Sales and Use Taxes; (b) Customs Taxes and Inspection Fees; (c) Business and Mercantile Taxes; and (d) Excise Taxes.  The Debtors remit the Taxes and Fees to various federal, state and local governments, including taxing and licensing authorities (collectively, the "Taxing Authorities").  Taxes and Fees are remitted and paid by the Debtors through checks and electronic funds transfers that are processed through their banks and other financial institutions.

63.    I believe that any failure to pay the Taxes and Fees may materially disrupt the Debtors' business operations in several ways: (i) the Taxing Authorities may initiate audits of the Debtors, which would unnecessarily divert the Debtors' attention from the restructuring process and (ii) the Taxing Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that will harm the estates. Moreover, unpaid Taxes and Fees may result in penalties, the accrual of interest, or both.  For the foregoing reasons, I believe that it is in the best interests of the Debtors' estates that the Debtors be authorized to pay the Taxes and Fees.

G.    **Insurance Motion**

64.    By the *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Continue Insurance Policies and Agreements Relating Thereto, (II) Honor Certain Prepetition Obligations in Respect Thereof, (III) Renew, Revise, Extend, Supplement or Enter into New Insurance Coverage and Insurance Premium Financing as Needed, and (IV) Continue to Honor Insurance Premium Financing Obligations* (the "Insurance Motion"), the Debtors seek

9

entry of interim and final orders authorizing the Debtors to: (i) maintain coverage under existing insurance policies and surety bonds entered into prepetition and satisfy prepetition obligations related thereto, including paying on an uninterrupted basis all premiums, brokerage fees, deductibles and administration fees arising thereunder or in connection therewith (collectively, the "Insurance Obligations") in an aggregate amount not to exceed $3,906 on an interim basis and $3,906 on a final basis on account of (a) the Insurance Obligations and (b) total annual premiums for the Surety Bonds; (ii) renew, revise, extend, supplement or enter into new insurance policies and premium financing arrangements, in the ordinary course of business, as needed in their business judgment; and (iii) continue to honor their Premium Financing Obligations (as defined below).

65.    In connection with the operation of the Debtors' businesses and the management of their properties, the Debtors maintain a comprehensive insurance program that provides coverage related to, among other things, general liability, director's and officers' liability, business auto, commercial property, inland marine, pollution, flight school and hull liability, and CGL & FBO (collectively, the "Insurance Policies").

66.    In the ordinary course, the Debtors finance the premium payments for certain of their Insurance Policies (collectively, the "Financed Policies"), pursuant to premium financing agreements ("PFAs") with First Insurance Funding Corporation (the "Premium Financing Provider"). Additionally, the Debtors employ Rhodes Risk Advisors (the "Insurance Broker") to assist with the procurement and negotiation of their Insurance Policies.

67.    As of the Petition Date, the Debtors do not believe there are any amounts owing under the PFAs or to the Insurance Broker. Out of an abundance of caution, the Debtors seek the authority, but not direction, to pay any prepetition obligations under the PFAs or to the Insurance

11731222.v4

Broker and any related postpetition obligations due in the ordinary course.  The Debtors are in the process of renewing their insurance policies in the ordinary course of business with the renewals expected to occur postpetition.  The Debtors have recently extended one Insurance Policy, relating to Flight School Hull and Liability Insurance.  In connection with this renewal, approximately $3,906 is owed to Old Republic Insurance Company on account of the prepetition amounts of such renewal.

68.    The ability to maintain the Insurance Policies, and to enter into new insurance policies, as needed in the ordinary course of business, is essential to the preservation of the value of the Debtors' businesses, operations and assets.  Much of the coverage provided by the Insurance Policies is required by regulations, laws and contracts that govern the Debtors' commercial and aviation-related activities.  Failure to pay premiums for the Insurance Policies when due may harm the Debtors' estates in several ways, including the loss of insurance coverage and subsequent need to obtain replacement insurance on an emergency basis, likely at a higher price.  Likewise, the Debtors' failure to pay obligations under the Financed Policies could result in the termination of the Insurance Policies, which would cause significant disruption and distraction to the Debtors' estates.  For these reasons, I believe the relief requested in the Insurance Motion is necessary and in the best interests of the Debtors' estates.

**H.    Wage and Employee Benefits Motion**

69.    By the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Benefits, and Other Compensation Obligations and (B) Maintain the Compensation and Benefits Programs, and (II) Granting Related Relief* (the "Wages Motion"), the Debtors seek the entry of an order (i) authorizing, but not directing, the Debtors to (a) pay and honor certain prepetition wages, benefits and other compensation obligations in an aggregate amount not to exceed $104,287 on an interim basis and $104,287 on a

final basis, and (b) maintain their employee programs, benefits and policies in the ordinary course of business, and (ii) granting related relief.

70.    As of the Petition Date, the Debtors employ approximately 24 people (collectively, the "Employees").  The Employees include 17 Employees who are employed on a full-time basis, 7 Employees who are employed on a part-time basis, none of which are unionized.

71.    The Employees perform a wide variety of functions critical to providing service and support to the Debtors' and the administration of these chapter 11 cases.  The employees' skills, knowledge, and understanding of the Debtors' operations are essential to preserving operational safety, stability, and efficiency.  Given the complexity of the Debtors' aviation-focused business, many of their employees are highly trained specialists, with technical skills, who are difficult to replace.  Without the continued, uninterrupted services of their employees, the Debtors' value-maximizing administration of these chapter 11 cases would be materially impaired.

72.    In the ordinary course of business, the Debtors incur obligations to their Employees for wages, overtime, and similar obligations (collectively, "Wage Obligations").  As of the Petition Date, the Debtors estimate that they owe approximately $67,699 on account of accrued but unpaid Wage Obligations, all of which will become due and payable within the Interim Period. The Debtors do not owe Wage Obligations to any individual in excess of the statutory cap of $17,150 set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.  The Debtors employe one insider that is owed funds during the Interim Period.[1]

73.    Each pay period, the Debtors deduct certain amounts directly from Employees' pay, including, but not limited to pre- and after-tax deductions payable pursuant to certain

---

[1] The insider receives a salary as the principal officer of the company.  The requested payments do not involve any bonus or incentive payments and are necessary to compensate the officer for their service to the Debtors. To the extent that any amounts are determined to be in excess of the Priority Cap, such funds will not be paid until the final hearing on the motion.

11731222.v4

employee benefits plans described herein, legally-ordered deductions, and other miscellaneous deductions (collectively, the "Deductions") and are additionally required to make matching payments from their own funds for Social Security and Medicare and to pay, based on a percentage of gross payroll, state and federal unemployment insurance, and employment training taxes (collectively, the "Payroll Tax Obligations", and together with the Deductions, the "Withholding Obligations"). The Debtors estimate that, as of the Petition Date, they have withheld approximately $32,315 in prepetition Withholding Obligations that must be paid or remitted within the Interim Period. By the Wages Motion, the Debtors seek authority, but not direction, to pay and remit the Withholding Obligations to the appropriate authorities consistent with the Debtors' prepetition practices.

74.     In the ordinary course of business, the Debtors provide eligible Employees with paid time off for vacation, personal days and sick leave (collectively, "Accrued PTO"). The Debtors request authority, by the Wages Motion, to honor all prepetition Accrued PTO if and when it comes due in the ordinary course, and continue to honor all postpetition Accrued PTO in the ordinary course of business. The Debtors do not intend to pay out any Accrued PTO unless otherwise required by law.

75.     Prior to the Petition Date and in the ordinary course of business, the Debtors reimbursed certain Employees for approved expenses incurred on behalf of the Debtors in the scope of their employment ("Reimbursable Expenses"). As of the Petition Date, the Debtors estimate that they currently owe approximately $2,000 on account of accrued and unpaid Reimbursable Expenses to Employees. The Debtors seek authority to satisfy all prepetition obligations related to the Reimbursable Expenses, including any associated fees in the ordinary course of business.

13

76.    In the ordinary course, the Debtors maintain various benefits plans, policies, and programs (the "Benefits Programs", and all amounts required under or relating thereto, the "Benefits Obligations"). The Benefits Programs generally fall into the following categories: (i) medical, prescription, dental, and vision benefits; (ii) 401(k) contributions; (iii) workers' compensation benefits; and (iv) certain other miscellaneous benefits programs, such as life insurance. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid Benefits Obligations, including administrative fees, is approximately $2,273, all of which will become due and payable during the Interim Period.

77.    I believe that the relief requested in the Wages Motion is crucial to ensuring the Debtors have as smooth a transition into bankruptcy as possible. The Debtors' business depends upon their Employees. Honoring the Workforce Obligations and Employee Programs is essential to ensure continued reliability and loyalty among the Debtors' workforce. I am also informed and believe that without the relief requested in the Wages Motion, Employees will likely seek alternative employment opportunities. Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to operate their businesses and maximize the value of their estates during this chapter 11 process. The loss of valuable Employees and the resulting need to recruit new personnel (and the costs attendant thereto) would be distracting at this crucial time when the Debtors need to focus on administering a value-maximizing chapter 11 process. Accordingly, based on the foregoing and those additional reasons set forth in the Wages Motion, I believe that the relief requested in such motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

## I.      Cash Management Motion

78.      By the *Debtors' Motion for Interim and Final Orders (I) Authorizing Continued Used of Existing Cash Management System, Bank Accounts, and Business Forms and Payment of Related Prepetition Obligations, (II) Authorizing Continuation of Ordinary Course Intercompany Transactions, (III) Extending Time to Comply with the Requirements of 11 U.S.C. § 345(b), and (IV) Granting Related Relief* (the "Cash Management Motion"), the Debtors seek the entry of an order (i) authorizing, but not directing, the Debtors to continue to use their prepetition cash management system, including by authorizing the Debtors' banks to honor certain transfers and charge certain fees; (ii) authorizing the Debtors to continue ordinary course intercompany transactions; (iii) extending the Debtors' time to comply with the requirements of section 345(b) of the Bankruptcy Code; and (iv) granting related relief.

79.      The Debtors maintain an integrated, centralized cash management system (the "Cash Management System") to collect, transfer, manage and disburse funds generated and used in their operations.  The Cash Management System facilitates cash monitoring, forecasting and reporting, cash collection, disbursements, and intercompany transfers, and enables the Debtors to administer efficiently their bank accounts (collectively, along with any bank accounts the Debtors may open in the ordinary course of business or that may be inadvertently excluded, the "Bank Accounts").  The Bank Accounts are maintained at Huntington National Bank ("HNB"), PNC Bank, N.A. ("PNC") and Brentwood Bank ("Brentwood", together with HNB and PNC and any other banks at which additional Bank Accounts are opened, the "Banks").

80.      By the Cash Management Motion, the Debtors request that the Court authorize the Debtors to maintain their Cash Management System, including the continued use of the Bank

Accounts, and authorize the Banks to maintain, service, and administer the Bank Accounts without interruption and in the ordinary course of business.

81.    In accordance with Local Rule 1002-7(a), the Debtors note that, under the Cash Management System, in the ordinary course of business, there are some transfers between Debtors (the "Intercompany Transactions"). Specifically, funds are moved between the PFTC Account and the PNC Account as funds are needed to satisfy necessary disbursements. The Debtors and their advisors are able to maintain records of the Intercompany Transactions postpetition and thus will be able to ascertain, trace and account for their Intercompany Transactions. The Debtors do not engage in any such transactions with non-debtor affiliates. In the ordinary course of business, the Banks charge, and the Debtors pay, honor or allow deduction from the appropriate Bank Account, certain service charges, fees and other costs and expenses associated with maintaining the accounts in accordance with the applicable agreements or schedules of fees governing the Bank Accounts (collectively, the "Service Charges"). The Debtors estimate that there is approximately $600 of accrued but unpaid Service Charges outstanding as of the Petition Date, all of which will become due and owing during the Interim Period. Accordingly, by the Cash Management Motion, the Debtors request authority, but not direction, to honor and pay prepetition Services Charges in an amount not to exceed $1,100.

82.    As part of the Cash Management System, the Debtors use various business forms, such as checks, invoices, letterhead, and other business and marketing materials in the ordinary course of their business (the "Business Forms"). To minimize expenses and disruption, the Debtors seek authority through the Cash Management Motion to continue to use all Business Forms in substantially the form used immediately before the Petition Date, without reference to the Debtors' status as debtors in possession. Requiring the Debtors to change existing Business Forms would

16

unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses on the estates. The Debtors intend to communicate with their various vendors and counterparties to notify them of the commencement of these Chapter 11 Cases. Therefore, the Debtors seek a waiver of Local Rule 2015-1(c)(1); *provided* that, to the extent the Debtors exhaust their existing supply of checks during these cases and require new checks, the Debtors will order checks with a notation indicating the designation "debtor in possession" and the applicable case number.

83.    I believe that maintaining the Cash Management System is critical to the Debtors' ability to administer these Chapter 11 Cases. If the Debtors are unable to maintain their Cash Management System, then the Debtors' operations will be severely impeded. In particular, any disruptions in the Cash Management System could lead to delays in satisfying the Debtors' obligations to their vendors, suppliers, and employees. To avoid the potential erosion of value that could ensue from any such disruptions in the Debtors' operations, I believe it is necessary that the Court authorize the Debtors to continue the Cash Management System consistent with their historical practices.

**J.    Utilities Motion**

84.    By the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, and (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service* (the "Utilities Motion"), the Debtors seek the entry of an order (i) authorizing Debtors' proposed form of adequate assurance of payment to utility companies, (ii) establishing procedures for resolving objections by utility companies, and (iii) prohibiting utility companies from altering, refusing, or discontinuing service.

85.    In the ordinary course of business, the Debtors obtain traditional utility services related to the day-to-day operation and/or maintenance of their businesses from approximately

twenty-five (25) different utility providers (each a "Utility Company" and collectively, the "Utility Companies"), for, *inter alia*, water and sewer, trash removal, electricity, gas, telephone and internet services (the "Utility Services"). The Debtors estimate that the cost for the Utility Services during the next month (not including any deposits to be paid) will be approximately $10,000. The Debtors intend to pay their undisputed postpetition obligations to the Utility Companies on a timely basis and have the ability to do so.

86.      Uninterrupted Utility Services are essential to the continued operation of the Debtors' businesses and, consequently, to the success of their Chapter 11 Cases. Should any Utility Company alter, refuse, or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, and such disruption would jeopardize the Debtors' reorganization efforts and patient safety. Accordingly, the Debtors seek to establish an orderly process for providing adequate assurance to their Utility Companies without hindering the Debtors' ability to function as a going concern.

87.      I believe that uninterrupted Utility Services are essential to the Debtors' business operations during the pendency of these chapter 11 cases. Should any Utility Company alter, refuse, or discontinue service, even for a brief period, the Debtors' business operations could be disrupted, and such disruption could jeopardize the Debtors' restructuring efforts. Therefore, the Debtors seek to establish an orderly process for providing adequate assurance to their Utility Companies without hindering the Debtors' ability to maintain operations. I am informed and believe that the proposed Adequate Assurance Procedures (as defined in the Utilities Motion) are consistent with procedures that are typically approved in chapter 11 cases in this District. Accordingly, based on the foregoing and those additional reasons set forth in the Utilities Motion, I believe that the relief requested in such motion is necessary to avoid immediate and irreparable

11731222.v4

harm and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

### K.    Vendor Motion

88.    By the *Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing, but Not Directing, the Debtors to Pay Certain Prepetition Claims of Lien Claimants, 503(b)(9) Claimants, and Critical Vendors and Granting Related Relief* (the "Vendor Motion"), the Debtors seek entry of an Interim Order authorizing, but not requiring, the Debtors to pay certain lien claims, 503(b)(9) claims, and certain critical vendors in the amount of $51,412 on an interim basis and $201,412 on a final basis.

89.    The Debtors have identified the Critical Vendors as vital to the Debtors' go-forward operations.  In many cases, the Critical Vendors provide products and services that are only available from a limited number of vendors, and in some cases, only one vendor.  Even where alternative vendors exist, the costs and business disruptions associated with switching from one vendor to another are often significant and would be detrimental to the Debtors' estates.  These Critical Vendors do not have long-term contracts that would allow the Debtors to compel their performance during these cases.  Accordingly, in light of the potential for immediate, irreparable consequences if the Critical Vendors fail to continue to provide uninterrupted and timely deliveries of goods and services, the Debtors have determined, in the exercise of their business judgment, that payment of the Critical Vendor Claims is essential to preserve the go-forward business and to avoid costly disruptions in the Debtors' operations.

90.    Lien Claimants.  As part of the Debtors' FBO and flight school business, the Debtors utilize certain vendors for select or specialized aircraft maintenance.  These parties may be able to assert liens against the Debtors' property, or property of their customers, that far exceeds the amounts that are owed to such vendors (the "Lien Claims").  If the Debtors are unable to satisfy

11731222.v4

the claims of these vendors (the "Lien Claimants"), these parties may encumber or otherwise hold the Debtors' property which would damage the Debtors' business far in excess of the costs of satisfying such claims. The Debtors seek authority through the Vendor Motion to pay only those amounts that they determine are necessary or appropriate to (a) obtain release of critical or valuable goods being held by the Lien Claimants and (b) induce the Lien Claimants to continue to provide services and make repairs. Accordingly, the Debtors seek authority to pay and discharge, on a case-by-case basis, the Lien Claims in an aggregate amount up to $175,098.

91.    503(b)(9) Claimants. The Debtors may have received certain goods or materials from various vendors within the twenty (20) days before the Petition Date (the "503(b)(9) Claimants"). The value of such goods or materials would be accorded administrative priority under section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claims"). Pursuant to this motion, the Debtors seek authority to pay and discharge, on a case-by-case basis, the 503(b)(9) Claims in an aggregate amount up to $15,423.

92.    The Critical Vendors. By the Vendor Motion, the debtors also seek to pay prepetition amounts owed to certain vendors (the "Critical Vendors") they deem critical to their operations (the "Critical Vendor Claims") up to $10,890 on an interim basis (the "Interim Critical Vendors Cap") and, inclusive of amounts paid pursuant to the Interim Critical Vendors Cap, $10,890 on a final basis.

93.    The Debtors have identified the Critical Vendors as vital to the Debtors' go-forward operations. In many cases, the Critical Vendors provide products and services that are only available from a limited number of vendors, and in some cases, only one vendor. Even where alternative vendors exist, the costs and business disruptions associated with switching from one vendor to another are often significant and would be detrimental to the Debtors' estates. These

20

Critical Vendors do not have long-term contracts that would allow the Debtors to compel their performance during these cases.

94.     Recognizing that payment of all prepetition claims of these third-party vendors outside of a plan of reorganization would be extraordinary relief, the Debtors, with the assistance of their advisors, reviewed their books and records, consulted with operations management and purchasing personnel, reviewed contracts and supply agreements, if any, and analyzed applicable laws, regulations, and historical practices to identify the limited number of vendors that are critical to the continued and uninterrupted operation of the Debtors' business—the loss of which could materially harm their business, shrink their market share, reduce their enterprise value, and impair going-concern viability.  Accordingly, the Debtors seek authority to pay and discharge, on a case by case basis, the Critical Vendor Claims in an aggregate amount up to $15,423.  The Debtors intend to pay prepetition Critical Vendor Claims only where they believe, in their business judgment, that the benefits from making such payments will exceed the costs to their estates.

95.     <u>Customary Trade Terms</u>.  The Debtors seek authorization to condition payment of the critical vendor claims upon such claimant's agreement to continue, or recommencement of, supplying such products and services to the Debtors in accordance with trade terms (including credit limits, discounts, pricing, timing of payments, availability, and other terms) consistent with the parties' ordinary course practice or as otherwise agreed by the Debtors in their reasonable business judgment (the "<u>Customary Trade Terms</u>"). The Debtors are also requesting that if any party accepts payment pursuant to the relief requested by the Vendor Motion and thereafter does not continue to provide goods or services on Customary Trade Terms, then:  (a) the Debtors may take any and all appropriate steps to cause such Critical Vendor to repay payments made to it on account of its prepetition claim to the extent that such payments exceed the postpetition amounts

21

then owing to such Critical Vendor; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by the Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

96.     I am informed and believe that the proposed relief sought by the Debtors in the Vendor Motion is consistent with relief typically approved in chapter 11 cases in this District. Accordingly, based on the foregoing and those additional reasons set forth in the Vendor Motion, I believe that the relief requested in such motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest

**L.      Schedules Extension Motion**

97.     By the *Debtors' Emergency Motion for Entry of an Order Extending the Time within which Debtors Must File their Schedules of Assets and Liabilities and Statements of Financial Affairs* (the "Schedules Extension Motion"), the Debtors seek the entry of an Order extending the initial 14-day period by which the Debtors are required to file their schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules and Statements") by an additional 14 days, for a total of 28 days after the Petition Date.

98.     Because of the complexity and size of their businesses and the limited time and resources that the Debtors have had to devote to the preparation of Schedules and Statements prior to commencement of these cases, the Debtors require additional time to prepare the Schedules and Statements.     Accordingly, the Debtors request that the Court extend the date by which the

11731222.v4

Schedules and Statements must be filed pursuant to Bankruptcy Rule 1007 by an additional 14 days, for a total of 28 days from the Petition Date.

99.    I have reviewed each of the first day motions, including the exhibits thereto. The Debtors believe, and I agree, that the Debtors have satisfied the applicable standards for the relief requested in each of the first day motions and that the Court's grant of the requested relief is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the first day motions should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: September 29, 2025                    Respectfully submitted,

                                             */s/ David Nolletti*_____
                                             David Nolletti
                                             Chief Restructuring Officer

11731222.v4

**Exhibit A**

**Organizational Chart**

13



11731219.v5

## Exhibit B

**Restructuring Support Agreement**

Docusign Envelope ID: 3879A7A1-15EB-4646-B8C3-7FB2F1ED91ED

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF SUPPORT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THIS AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS AGREEMENT.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN, AND THE CLOSING OF ANY RESTRUCTURING SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN.

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (this "**Agreement**") is entered into as of September 28, 2025 (the "**Agreement Effective Date**"), by and among (i) CORPORATE AIR, LLC, a Pennsylvania limited liability company ("**Corporate Air**"), STEEL CITY AVIATION, LLC, a Pennsylvania limited liability company ("**Steel City**"), CHEYENNE, LLC, a Pennsylvania limited liability company ("**Cheyenne**"), SCHREINER AIR INVESTMENTS, LLC, a Pennsylvania limited liability company ("**Schreiner**"), PITTSBURGH FLIGHT TRAINING CENTER, INC., a Pennsylvania corporation ("**Flight Training**"), STEEL CITY AVIATION, INC., a Pennsylvania corporation ("**Steel City Corp**"), CAM INVESTMENTS, INC., a Pennsylvania corporation ("**CAM**") (hereinafter, Corporate Air, Steel City, Cheyenne, Schreiner, Flight Training, Steel City Corp and CAM are individually and collectively, jointly and severally, referred to as the "**Debtors**" or the "**Company**", and each, a "**Debtor**"), and (ii) Vantage AGC LLC (the "**Sponsor**"). The Company and the Sponsor are each referred to as a "**Party**" and collectively referred to as the "**Parties**." Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Restructuring Term Sheet (as defined below).

## RECITALS

WHEREAS, prior to the date hereof, the Parties have discussed consummating a restructuring of the Company as set forth in this Agreement and the accompanying Restructuring Term Sheet (as defined herein) (the "**Restructuring**");

WHEREAS, the Restructuring contemplated, among other things, a sale of substantially all of the Company's assets to the Sponsor pursuant to that certain *Asset Purchase Agreement* dated as of September 12, 2025 by and among the Company and the Sponsor (the "**Sponsor APA**"), which is attached hereto;

Docusign Envelope ID: 3879A7A1-15EB-4646-B8C3-7FB2F1ED91ED

WHEREAS, the Parties desire to implement the Restructuring through Chapter 11 bankruptcy filings of the Company (the "**Chapter 11 Cases**"), which Chapter 11 Cases the Company will commence by no later than September 29, 2025 (the "**Outside Petition Date**");

WHEREAS, the Parties will undertake to effect the Restructuring through a plan of reorganization under Chapter 11 of the Bankruptcy Code, which plan shall be consistent in all material respects with the terms and conditions set forth in the Sponsor APA and the Restructuring Term Sheet (defined below) and otherwise in form and substance acceptable to the Sponsor in its sole discretion (the "**Plan**");

WHEREAS, this Agreement and the Restructuring Term Sheet, which is incorporated herein by reference and is made part of this Agreement, set forth the agreement among the Parties concerning their commitment, subject to the terms and conditions hereof and thereof, to implement the Restructuring. In the event the terms and conditions as set forth in the Restructuring Term Sheet and this Agreement are inconsistent, the terms and conditions in this Agreement shall govern and control, except to the extent the inconsistency concerns the economics of the Restructuring, in which case the terms and conditions of the Restructuring Term Sheet shall govern and control;

NOW, THEREFORE, in consideration of the promises and mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party agrees as follows:

## STATEMENT OF AGREEMENT

1.    <u>Definitions</u>. The following terms shall have the following definitions:

"**Agreement**" has the meaning set forth in the preamble hereto.

"**Alternative Transaction**" has the meaning set forth in Section 2(e) hereto.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 <u>et</u> <u>seq</u>.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Western District of Pennsylvania.

"**Business Day**" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by law or governmental action to close.

"**Chapter 11 Cases**" means any voluntary chapter 11 case(s) commenced by the Company.

"**Confirmation Order**" means an order entered by the Bankruptcy Court confirming the Plan, including all exhibits, appendices and related documents, each consistent in all material respects with the Restructuring Term Sheet and otherwise in form and substance acceptable to the Sponsor in its sole discretion.

"**Definitive Documents**" means the documents listed in Section 6.

"**DIP Financing**" means debtor-in-possession financing to be provided by the Sponsor pursuant to the terms set forth on the Restructuring Term Sheet.

"**DIP Financing Orders**" means the interim and final orders entered by the Bankruptcy Court approving the debtor-in-possession financing to be provided by the Sponsor pursuant to the terms set forth in the Restructuring Term Sheet, which orders shall be in form and substance acceptable to the Sponsor in its sole discretion.

"**Disclosure Statement**" means the disclosure statement in respect of the Plan which shall be consistent in all material respects with the Restructuring Term Sheet and otherwise in form and substance acceptable to the Sponsor in its sole discretion.

"**Disclosure Statement Order**" means the order entered by the Bankruptcy Court approving the Disclosure Statement and authorizing the solicitation of votes on the Plan, which shall be consistent in all material respects with the Restructuring Term Sheet and otherwise in form and substance acceptable to the Sponsor in its sole discretion.

"**Effective Date**" means the date on which all conditions to consummation of the Plan have been satisfied (or waived) and the Plan becomes effective.

"**GUC Fund**" means cash in the amount of $[___] to be distributed to holders of Allowed General Unsecured Claims, but only to the extent that the class of General Unsecured Claims votes in favor of the Plan.

"**Outside Petition Date**" has the meaning set forth in the Recitals herein.

"**Person**" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group or any legal entity or association.

"**Petition Date**" means the date the Chapter 11 Cases of the Company are commenced

"**Plan**" has the meaning set forth in the Recitals herein.

"**Plan Related Documents**" means the Plan, the Disclosure Statement, the Solicitation Materials, the Confirmation Order, any Plan supplement documents, any required security documents, along with any other documents or agreements, whether or not filed with the Bankruptcy Court by the Company, that are necessary to implement the Plan, the Restructuring and the Restructuring Term Sheet pursuant to an out-of-court restructuring or the Chapter 11 Cases; provided that each of the foregoing documents shall be consistent in all material respects with the Restructuring Term Sheet and otherwise in form and substance acceptable to the Sponsor in its sole discretion.

3

Docusign Envelope ID: 3879A7A4-15EB-4646-B8C3-7FB2F1ED91ED

"**Prepetition Bridge Note**" means that certain Secured Promissory Note, dated August 26, 2025, by the Borrowers in favor of the Sponsor, as amended, amended and restated or otherwise modified from time to time.

"**Restructuring**" has the meaning set forth in the Recitals herein.

"**Restructuring Term Sheet**" means that certain term sheet containing the material terms and provisions of the Restructuring agreed upon by the Parties hereto that are to be incorporated into the Plan and Plan Related Documents, a copy of which is attached hereto as <u>Exhibit A</u>.

"**Solicitation Materials**" means the Disclosure Statement and other solicitation materials in respect of the Plan as approved by the Bankruptcy Court pursuant to Section 1125(b) of the Bankruptcy Code.

"**Sponsor**" has the meaning set forth in the Recitals herein.

"**Sponsor Claims**" means the claims held by the Sponsor on account of the Prepetition Bridge Note.

"**Sponsor APA**" has the meaning set forth in the preamble herein.

"**Transfer**" has the meaning set forth in Section 7 herein.

"**Termination Date**" has the meaning set forth in Section 4 herein.

"**Termination Event**" has the meaning set forth in Section 4 herein.

2.    <u>Commitment of the Sponsor</u>. Subject to the terms and conditions of this Agreement and the terms and conditions set forth in the Restructuring Term Sheet and for so long as no Termination Event has occurred, the Sponsor, on its behalf and on behalf of its controlled affiliates or designees, agrees that:

a)      So long as its vote has been properly solicited pursuant to sections 1125 and 1126 of the Bankruptcy Code, the Sponsor shall vote all Sponsor Claims, now or hereafter beneficially owned by the Sponsor, in favor of the Plan in accordance with the applicable procedures set forth in the Solicitation Materials, and timely return a duly executed ballot in connection therewith;

b)      The Sponsor shall take any and all necessary and appropriate actions in furtherance of effectuating the DIP Financing;

c)      The Sponsor shall take any and all necessary and appropriate actions in furtherance of the Restructuring and the transactions contemplated under the Restructuring Term Sheet, the Plan and all other Plan Related Documents;

11723763.v2

Docusign Envelope ID: 3879A7A4-15E8-4646-B8C3-7FB2F1ED91ED

d)  The Sponsor shall negotiate in good faith the Definitive Documents and any other documents otherwise necessary to effectuate the Restructuring, including, but not limited to the Plan, Disclosure Statement and Plan Related Documents, which shall be in form and substance acceptable to the Sponsor in its sole discretion, on the terms and subject to the conditions as substantially set forth in this Agreement;

e)  The Sponsor shall not take any action inconsistent with this Agreement, the Restructuring Term Sheet, or the confirmation and consummation of the Plan; and

f)  Following the commencement of the Chapter 11 Cases, the Sponsor shall not (i) object to the Plan, Disclosure Statement or the consummation of the Restructuring Term Sheet or Plan, or any efforts to obtain acceptance of, and to confirm and implement, the Plan; (ii) initiate any legal proceedings that are inconsistent with or that would delay, prevent, frustrate or impede the approval, confirmation or consummation of the Restructuring, the Disclosure Statement or the Plan or the transactions outlined therein or in the Restructuring Term Sheet or otherwise commence any proceedings to oppose any of the Plan Related Documents, or take any other action that is barred by this Agreement; (iii) vote for, consent to, support or participate in the formulation of any other restructuring or settlement of the Company's claims, any other transaction involving the Company or its assets, or any plan of reorganization (with the sole exception of the Plan) or liquidation under applicable bankruptcy or insolvency laws, whether domestic or foreign, in respect of the Company; (iv) directly or indirectly seek, solicit, support, formulate, entertain, encourage or engage in discussions, or enter into any agreements relating to, any restructuring, plan of reorganization, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, transaction, sale, disposition or restructuring of the Company (or any of its assets or stock) other than the Plan or as otherwise set forth in the Restructuring Term Sheet (collectively, (iii) and (iv), an "**Alternative Transaction**"); (v) engage in or otherwise participate in any negotiations regarding any Alternative Transaction, enter into any letter of intent, memorandum of understanding, agreement in principle or other agreement relating to any Alternative Transaction; (vi) solicit, encourage, or direct any Person to undertake any action set forth in clauses (i) through (v) of this subsection (e); or (vii) permit any of its, or its controlled affiliates', officers, directors, managers, employees, partners, representatives and agents to undertake any action set forth in clauses (i) through (vi) of this subsection (e).

Notwithstanding the foregoing, nothing in this Agreement shall be construed to prohibit the Sponsor from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases so long as such appearance and the positions advocated in connection therewith are consistent with this Agreement and otherwise in furtherance of the Restructuring and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the Restructuring.

3.  <u>Commitment of the Company</u>. Subject to Section 14 herein and for so long as no Termination Event has occurred, the Company agrees to:

a)  support and complete the Restructuring and all transactions contemplated under this Agreement, the Restructuring Term Sheet, the Plan and all other Plan Related Documents;

b)  negotiate in good faith the Definitive Documents contemplated by this Agreement or otherwise necessary to effectuate the Restructuring, including, but not limited to the Plan, Disclosure Statement and Plan Related Documents, which shall be in form and substance acceptable to the Sponsor in its sole discretion, on the terms and subject to the conditions as substantially set forth in this Agreement;

c)  take any and all necessary and appropriate actions in furtherance of the Restructuring and the transactions contemplated under the Restructuring Term Sheet, the Plan and all other Plan Related Documents;

d)  take any and all reasonable, necessary and appropriate actions in furtherance of effectuating the DIP Financing;

e)  oppose, object to and timely file a formal written response in opposition to any objection filed with the Bankruptcy Court by any Person with respect to the Restructuring, including the Plan, the Disclosure Statement, the Plan Related Documents, and the DIP Financing and any motion related thereto (provided that the Parties may agree that no written response is required with respect to certain objections);

f)  timely file a formal objection or other opposition to any motion, pleading, application, adversary proceeding or cause of action filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing any of the Chapter 11 Cases, (iv) modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable or (v) for relief that (y) is inconsistent with this Agreement or any Definitive Document in any material respect or (z) would or would reasonably be expected to frustrate the purposes of this Agreement or any Definitive Document, including by preventing consummation of the Restructuring;

g)  complete the Restructuring and all transactions contemplated under the Restructuring Term Sheet, the Plan and all other Plan Related Documents within the Case Milestones set forth in this Agreement;

h)  obtain any and all required governmental, regulatory and/or third-party approvals for the Restructuring (including those of any Aviation Regulatory Authority);

11723763.v2

i)      take no actions inconsistent with this Agreement, the Restructuring Term Sheet, or the confirmation and consummation of the Plan;

j)      comply with each Case Milestone set forth in Section 5 herein;

k)      not initiate any legal proceedings that are inconsistent with or that would delay, prevent, frustrate or impede the approval, confirmation or consummation of the Restructuring, the Disclosure Statement or the Plan or the transactions outlined therein or in the Restructuring Term Sheet or otherwise commence any proceedings to take any other action that is barred by this Agreement;

l)      not commence or support any avoidance action or other legal proceeding (or consent to any other Person obtaining standing to commence any such avoidance action or other legal proceeding) that challenges the validity, enforceability, or priority of any liens and claims of the Sponsor, including any liens and claims related to the Prepetition Bridge Note and the DIP Financing;

m)      not directly or indirectly seek, solicit, consent to, support, formulate, propose, participate in, entertain, encourage or engage in discussions, or enter into any agreements relating to an Alternative Transaction, subject to the fiduciary duties of debtors and debtors in possession in chapter 11 proceedings, including as set forth in Section 14 of this Agreement;

n)      take any and all reasonable, necessary and appropriate actions to seek payment of the Breakup Fee, if applicable;

o)      pay in full and in cash all fees, costs, and expenses in accordance with Section 18 of this Agreement, the DIP Financing Orders, and the Plan; and

p)      not permit any of its, or its controlled affiliates', officers, directors, managers, employees, partners, representatives and agents to undertake any action set forth in this Section 3.

4.      <u>Termination</u>. This Agreement may be terminated by (a) the mutual consent of the Company and the Sponsor, or (b) either the Company or the Sponsor upon the occurrence of any of the following events (each a "**Termination Event**"); <u>provided</u>, <u>however</u> that the Company may not terminate this Agreement upon the occurrence of a Termination Event pursuant to clause (d)(I) below and the Sponsor may not terminate this Agreement upon the occurrence of a Termination Event pursuant to clause (d)(II) below; <u>provided further that</u>, in the event the Company or the Sponsor provide written notice of a Termination Event, the Company and the Sponsor, as applicable shall have five (5) Business Days to seek a Bankruptcy Court determination that no Termination Event has occurred or that such Termination Event has been cured:

a)      the Company shall have (1) announced its intention not to pursue the Restructuring, or (2) solicited, proposed, or accepted an Alternative Transaction;

Docusign Envelope ID: 3879A7A1-15EB-4C16-B8C3-7FB2F1ED51ED

b)      any court of competent jurisdiction or other competent governmental or regulatory authority shall have issued an order making illegal or otherwise restricting, preventing or prohibiting the Restructuring in a manner that cannot reasonably be remedied by the Company or the Sponsor;

c)      the occurrence of any event, fact or circumstance which would (individually or in the aggregate), excluding effects of or limitations caused by the Chapter 11 Cases and the DIP Financing Orders, (i) have a material adverse effect on the business, assets, financial condition, liabilities or results of operations of the Company taken as a whole; or (ii) materially impair the ability of the Company to consummate the transactions contemplated by, or to perform its obligations under, this Agreement or the Restructuring Term Sheet;

d)      the occurrence of a material breach by any of the Parties of any of its obligations, covenants or commitments set forth in this Agreement, and any such breach is either unable to be cured or is not cured by five (5) Business Days after receipt of written notice (I) from the Sponsor, in the case of a breach by the Company, or (II) from the Company, in the case of a breach by the Sponsor;

e)      the DIP Facility is not approved by the Bankruptcy Court or is terminated in accordance with the terms of the DIP Credit Agreement and the DIP Financing Orders;

f)      the Company fails to operate in the ordinary course of business consistent with recent past practice in all material respects (other than any changes in operations (I) resulting from or relating to the Plan or the proposed or actual filing of the Chapter 11 Cases, (II) as a consequence of the management services agreement, or (III) imposed by the Bankruptcy Court); provided, however, any written notice of termination based on this provision shall specify what actions the Company or its advisors could take, if any, to cure such failure and that taking such actions within five (5) Business Days would be deemed to cure this Termination Event;

g)      the commencement of an involuntary case against the Company under the Bankruptcy Code if such involuntary case is not dismissed within sixty (60) days of it having been commenced (so long as no order for relief is theretofore entered), unless such involuntary case has been converted to a chapter 11 case with the consent of the Company and no other Termination Event has occurred;

h)      the Company fails to adhere to any of the Case Milestones set forth in Section 5 of this Agreement;

i)      the Definitive Documents, Plan Related Documents, and any amendments, modifications, supplements, or other documents related to the foregoing, including motions, exhibits, appendices, and orders, are inconsistent with

this Agreement and the Restructuring Term Sheet, or not reasonably acceptable to the Sponsor;

j) the appointment of a trustee, receiver, examiner with expanded powers, responsible person or responsible officer in any of the Chapter 11 Cases;

k) the Bankruptcy Court enters an order modifying or terminating the Company's exclusive right to file and solicit acceptances of a plan of reorganization (including the Plan);

l) the Bankruptcy Court enters a final order disallowing, invalidating, subordinating, recharacterizing, avoiding, or declaring unenforceable the claims, liens or interests, in any material respect, held by the Sponsor except as may be set forth in the DIP Financing Orders or as otherwise agreed to by the Sponsor in its sole discretion; or

m) the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

The date on which this Agreement is terminated in accordance with the provisions of this Section 4 shall be referred to as the "**Termination Date**" and the provisions of this Agreement and the Restructuring Term Sheet shall terminate, except as otherwise provided in this Agreement, unless, in the case of this Section 4, within five (5) Business Days the Company and/or the Sponsor (as applicable) waive, in writing, the occurrence of or amend or modify any of the events set forth in this Section 4. In the event of the termination of this Agreement pursuant to this Section 4, written notice thereof shall forthwith be given to the other Party specifying the provision hereof pursuant to which such termination is made, and this Agreement shall be terminated and become void and have no effect and there shall be no liability hereunder on the part of any Party, except that Sections 14, 18, and 22–29 shall survive any termination of this Agreement. Nothing in this Section 4 shall relieve any Party of liability for any breach of this Agreement that occurred prior to the occurrence of the Termination Date.

5. <u>Restructuring Plan Milestones</u>. The Sponsor's support for the Restructuring shall be subject to the timely satisfaction of the following milestones (the "**Case Milestones**"), which may be waived or extended with the prior written consent of the Sponsor:

| Case Milestone | Deadline |
|---|---|
| Petition Date | No later than the Outside Petition Date |
| File motion setting bar dates | No later than 3 business days following the Petition Date |
| Entry of Interim DIP Order | No later than 3 calendar days following the Petition Date |

9

| File Plan, Disclosure Statement, and motion seeking entry of an order approving the Disclosure Statement | No later than 10 calendar days following the Petition Date |
|---|---|
| Entry of Final DIP Order | No later than 30 calendar days following the Petition Date |
| Entry of the Acceptable Disclosure Statement Order | No later than 40 calendar days following the Petition Date |
| Entry of the Confirmation Order | No later than 75 calendar days following the Petition Date |
| Effective Date of Plan | No later than 90 calendar days following the Petition Date |

6.    <u>Definitive Documents</u>.  The Definitive Documents governing the Restructuring shall include, as applicable, this Agreement and all other agreements, instruments, pleadings, filings, notices, letters, affidavits, applications, orders (whether proposed or entered), forms, questionnaires and other documents (including all exhibits, schedules, supplements, appendices, annexes, instructions and attachments thereto) that are utilized to implement or effectuate, or that otherwise relate to, the Restructuring (including all amendments, modifications, and supplements made thereto from time to time), including each of the following:

a) DIP Financing motion and related orders;

b) Disclosure Statement and related orders;

c) Solicitation Materials;

d) Plan;

e) Plan Supplement;

f) Confirmation Order;

g) New organizational documents;

h) All pleadings filed by the Company in connection with the Chapter 11 Cases (and related orders), but not including ministerial notices and similar ministerial documents, retention applications, fee applications, fee statements, any similar pleadings or motions relating to retention or fees of any professional, or statements of financial affairs and schedules of assets and liabilities;

i) Any and all filings with or requests for regulatory or other approvals from any governmental body including but not limited to any Aviation Regulatory Authority; and

j) Such other agreements, instruments, and documents as may be necessary or reasonably desirable to consummate and document the Restructuring.

Definitive Documents not executed or in a form attached to this Agreement remain subject to negotiation and completion, provided that such document shall be in form and substance acceptable to the Sponsor in its sole discretion.

7.     <u>Transfer of Sponsor Claims</u>. Notwithstanding anything to the contrary in this Agreement, the Sponsor agrees that until the occurrence of the Termination Date, it shall not sell, assign, transfer, convey, pledge, hypothecate or otherwise dispose of, directly or indirectly (each such transfer, a "**Transfer**"), all or any of its Sponsor Claims (or any right related thereto and including any voting rights associated with such Sponsor Claims) unless the transferee thereof (i) is a Sponsor or (ii)(a) agrees in writing by executing a joinder in the form of <u>Exhibit B</u> to assume and be bound by this Agreement and the Restructuring Term Sheet, and to assume the rights and obligations of the Sponsor under this Agreement and (b) promptly delivers such writing to the Company (each such transferee becoming, upon the Transfer, the Sponsor hereunder). The Company shall promptly acknowledge any such Transfer in writing and provide a copy of that acknowledgement to the transferor. By its acknowledgement of the relevant Transfer, the Company shall be deemed to have acknowledged that its obligations to the Sponsor hereunder shall be deemed to constitute obligations in favor of the relevant transferee. Any Transfer of any Sponsor Claim by the Sponsor that does not comply with the procedure set forth in the first sentence of this Section 7 shall be deemed void *ab initio*.

8.     <u>Reporting Requirements</u>. The Company agrees that it shall (i) make its chief restructuring officer or its financial advisor available via teleconference on a weekly basis to provide the Sponsor and its professionals with regular updates regarding the operation of the Company's business and financial condition, operations, the status and progress of the Restructuring, and status of obtaining any necessary or desirable authorizations with respect to the Restructuring from each Party, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange; (ii) provide the Sponsor and its professionals weekly financial reports until the consummation of the Restructuring Transaction; and (iii) provide prompt and reasonable responses to all reasonable diligence or reporting requests from the Sponsor and its professionals.

9.     <u>No Solicitation</u>. This Agreement is not and shall not be deemed to be a solicitation of votes for the acceptance of the Plan (or any other plan of reorganization) for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.

10.     <u>Ownership of Claims</u>. The Sponsor represents and warrants (severally and not jointly) that:

a.     as of the date of this Agreement, it is the beneficial owner of the principal amount of the Sponsor Claims, or is the nominee, investment manager or advisor for beneficial holders of the Sponsor Claims, as set forth on the signature page for the Sponsor provided, however, that the information contained therein shall be maintained as confidential by the Company and the Company's financial advisors and legal counsel, except to the extent otherwise required by law or any rule or

regulation of any exchange or regulatory authority, subject to the disclosure obligations set forth in Section 28 of this Agreement; and

b.  other than pursuant to this Agreement, such Sponsor Claims, are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrances of any kind, that might adversely affect in any way the Sponsor's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

11.  <u>Representations</u>.

(a) Each Party represents to each other Party that, as of the date of this Agreement:

(i) It has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations hereunder, and the execution, delivery and performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability, or similar action on its part;

(ii) The execution, delivery and performance of this Agreement by such Party does not and shall not (x) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its organizational documents or those of any of its subsidiaries or (y) conflict with, its organizational documents;

(iii) The execution, delivery and performance by it of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body, except such filing or consents as may be necessary to effectuate the assignment of the ground leases and contracts of the Company with the County Airport Authority;

(iv) Subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, it is the intent of each party that this Agreement is the legally valid and binding obligation of such Party, fully enforceable against it in accordance with its terms prior to and during the Chapter 11 Cases, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws, both foreign and domestic, relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b) The Sponsor represents to the Company that the Sponsor, in entering into this Agreement and undertaking its obligations hereunder, is acting independently and is not acting, directly or indirectly, through contract, arrangement, understanding, relationship or otherwise with any other holder of the Prepetition Bridge Note.

12.  <u>Entire Agreement</u>. This Agreement, including the exhibits, schedules and annexes hereto constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all other prior negotiations, agreements and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement.

11723763.v2

13.    <u>No Waiver</u>. This Agreement and the Restructuring Term Sheet are part of a proposed settlement of a dispute and other accommodations among the Parties. If the transactions contemplated by this Agreement are not consummated, or following the occurrence of the Termination Date, if applicable, nothing shall be construed by this Agreement as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

14.    <u>Company Fiduciary Duties</u>. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require the Company or its subsidiaries or any of its or their respective directors or officers (in such person's capacity as a director or officer) to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with such party's fiduciary duties and/or obligations under applicable law, including the Bankruptcy Code.

15.    <u>Break Fee.</u>   Notwithstanding the foregoing or anything to the contrary in this Agreement, in the event the Company: (a) breaches Section 3(l) of this Agreement; (b) accepts an Alternative Proposal or otherwise seeks to breach or terminate this Agreement in order to pursue an Alternative Proposal; (c) the Court approves an Alternative Proposal; or (d) the Company otherwise refuses or fails for any reason whatsoever (other than as a result of a breach of this Agreement by Sponsor) to consummate the Restructuring Transactions on the timeframes set forth herein, then the Sponsor, in addition to any and all rights and remedies that it has or may have under the Restructuring Plan, the Definitive Documents and all applicable law or equity, shall be entitled to the immediate payment and/or repayment, in full in Cash, of (i) all unpaid fees and expenses incurred by the Sponsor (including, for the avoidance of doubt, all fees and costs of Lowenstein Sandler LLP and Barnes & Thornburg LLP and any other of its professionals) in connection with the Restructuring, Sponsor APA, Plan, Definitive Documents, and Chapter 11 Cases; *plus* (ii) a termination/break-up fee in an amount equal to $500,000 (clauses (i) and (ii) collectively, the "**Break Fee**").  The Break Fee shall be payable as an administrative expense and subject to approval by the Bankruptcy Court.

16.    <u>Cooperation and Support</u>. The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent possible and subject to the terms of this Agreement) in respect of (i) all matters relating to their rights hereunder in respect of the Company or otherwise in connection with their relationship with the Company, and (ii) the consummation of the Restructuring. Furthermore, subject to the terms of this Agreement, each of the Parties shall take such action as reasonably may be necessary to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings and voting any claims or securities of the Company in favor of the Restructuring in connection therewith, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement. In addition, the Company shall provide draft copies of all Plan Related Documents, "first day" motions, applications, and proposed orders, and other documents the Company intends to file with the Bankruptcy Court to counsel to the Sponsor at least two (2) calendar days prior to the date when the Company intends to file such document and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing. Notwithstanding anything to the

contrary herein, the form and substance of the Definitive Documents shall be acceptable to the Sponsor in its sole discretion.

17.    <u>Representation by Counsel</u>. Each Party hereto acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party hereto with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived. The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties hereto. None of the Parties hereto shall have any term or provision construed against such Party solely by reason of such Party having drafted the same.

18.    <u>Independent Due Diligence and Decision-Making</u>. The Sponsor confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions and prospects of the Company.

19.    <u>Fees and Expenses</u>.  The Company shall pay in full in Cash all documented fees and costs when due of the Sponsor (regardless of whether such fees and expenses are incurred before or after the Petition Date), including the documented fees and expenses of Lowenstein Sandler LLP and Barnes & Thornburg LLP, and any such other advisors and consultants as may be reasonably retained on behalf of the Sponsor and, in each case, seek authority to pay such fees and expenses in connection with the DIP Financing Orders, the Plan, and the Confirmation Order. The Company hereby acknowledges and agrees that the Sponsor has expended, and will continue to expend, considerable time, effort and expense in connection with this Agreement and the negotiation of the transactions contemplated hereby, and that this Agreement provides substantial value to, is beneficial to, and is necessary to preserve, the Company and to effectuate the Restructuring Transactions, and that the Sponsor has made a substantial contribution to the Company.

20.    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

21.    <u>Amendments</u>. Except as otherwise provided in this Agreement, this Agreement (including the Restructuring Term Sheet) may not be modified, amended or supplemented without prior written consent of the Company and the Sponsor.

22.    <u>Headings</u>. The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation of this Agreement.

23.    <u>Specific Performance/Remedies</u>. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly

11723763.v2

with any of its obligations hereunder; provided, however, that each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

24.    Governing Law.    This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in the United States District Court for the Southern District of New York, and by execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

25.    Trial by Jury Waiver.    Each party hereto irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated thereby.

26.    Notices.    All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally, by email, courier, by facsimile transmission or mailed (first class postage prepaid) to the parties at the following addresses or emails:

If to the Company:

15 Allegheny County Airport
West Mifflin, Pennsylvania 15122
Attention: David Nolletti, CRO
 Email: David.Nolletti@riveron.com

with copies to:

Babst Calland
Two Gateway Center, Sixth Floor
Pittsburgh, Pennsylvania 15222
Attention: Justine Kasznica, Esq.
Email: JKasznica@babstcalland.com

Klehr Harrison Harvey Branzburg LLP
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Attention: Domenic Pacitti, Esq.
Email: DPacitti@klehr.com

Docusign Envelope ID: 3879A7A4-15EB-4646-B8C3-7FB3F1ED91ED

If to the Sponsor:

VANTAGE AGC LLC
24151 Ventura Blvd., Suite 150
Calabasas, California 91302
Attention: Ryan Maxfield; Kyle Cassidy; Matthew Hennessy
Email: rmaxfield@vantageair.com; kcassidy@vantageair.com;
mhennessy@jadiancapital.com

*with copies to*:

Lowenstein Sandler LLP
1251 Avenue of the Americas
New York, New York 10020
Attention: Steven E. Siesser, Esq., Jeffrey Cohen, Esq., Gianfranco Finizio, Esq.
Email: ssiesser@lowenstein.com; jcohen@lowenstein.com;
gfinizio@lowenstein.com

-and-

Barnes & Thornburg LLP
2029 Century Park East, Suite 300
Los Angeles, California 90067
Ryan J. Barncastle, Esq.
Email: ryan.barncastle@btlaw.com

27.     No Third-Party Beneficiaries. The terms and provisions of this Agreement are intended solely for the benefit of the Parties hereto and their respective successors and permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any Person.

28.     Successors and Assigns. Except as otherwise provided in this Agreement, this Agreement is intended to bind and inure to the benefit of each of the Parties and each of their respective successors, assigns, heirs, executors, administrators and representatives.

29.     Public Disclosure. The Sponsor hereby consents to the disclosure by the Company in the Plan, Disclosure Statement, the other Plan Related Documents and any filings by the Company with the Bankruptcy Court or the Securities and Exchange Commission or as required by law or regulation of the execution and contents of this Agreement; provided, however, that except as required by law or any rule or regulation of any securities exchange or any governmental agency, the Company shall not, without the Sponsor's prior written consent, (a) use the name of any Sponsor or its controlled affiliates, officers, directors, managers, stockholders, members, employees, partners, representatives and agents in any press release or filing with the Securities and Exchange Commission or (b) disclose the holdings of the Sponsor to any person. The Company and the Sponsor shall (a) consult with each other before issuing any press release or otherwise making any public statement with respect to the transactions contemplated by this Agreement, (b) provide to the other for review a copy of any such press release or public statement

16

and (c) not issue any such press release or make any such public statement prior to such consultation and review and the receipt of the prior consent of the other Party, unless required by applicable law or regulations of any applicable stock exchange or governmental authority, in which case, the Party required to issue the press release or make the public statement shall, prior to issuing such press release or making such public statement, use its commercially reasonable efforts to allow the other Party reasonable time to comment on such release or statement to the extent practicable; provided, that no Party need consult with any other Party with respect to any press release or public statement relating to the termination of this Agreement.

       30.    <u>Interpretation</u>. This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation of this Agreement is to be interpreted in a neutral manner; and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion of this Agreement, shall not be effective in regard to the interpretation of this Agreement.

[<i>Remainder of page intentionally blank</i>]

*Execution Version*

   **IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed on
the date first written above.

                              **COMPANY:**

                              **CORPORATE AIR, LLC**
                              **CAM INVESTMENTS, INC.**
                              **STEEL CITY AVIATION, LLC**
                              **CHEYENNE, LLC**
                              **SCHREINER AIR INVESTMENTS, LLC**
                              **PITTSBURGH FLIGHT TRAINING**
                              **CENTER, INC.**
                              **STEEL CITY AVIATION, INC.**


                              By: _____
                              Name:  David Nolletti
                              Title:  Chief Restructuring Officer



                              **SPONSOR:**

                              **VANTAGE AGC LLC**
                              By: _____
                              Name:  Ryan Maxfield
                              Title:  CEO

*Execution Version*

# **Exhibit A**

Restructuring Term Sheet

Docusign Envelope ID: 3879A7A1-15EB-4646-B8C3-7FB3F1ED31ED

*Execution Version*

## <u>RESTRUCTURING TERM SHEET</u>

September 28, 2025

This term sheet (this "**Term Sheet**") summarizes the principal economic and structural terms of a financial restructuring (the "**Restructuring**") of Corporate Air, LLC, Steel City Aviation, LLC, Cheyenne, LLC, Schreiner Air Investments, LLC, Pittsburgh Flight Training Center, Inc., Steel City Aviation, Inc., and CAM Investments, Inc. This Term Sheet is offered in the nature of a settlement proposal in furtherance of settlement discussions and is intended to be entitled to the protections of Federal Rule of Evidence 408 and any other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions. This Term Sheet is intended as an outline only of certain material terms of the proposed transactions described herein, and does not represent a commitment to lend, invest or provide financing or to negotiate to do any of these things. Furthermore, this Term Sheet does not constitute a waiver by any party, or an agreement or commitment by any party to forbear from taking any remedies to which such party may be entitled. This Term Sheet and the terms, conditions and assumptions contained herein are subject to the negotiation and execution of definitive documentation for the transactions described herein, including the Restructuring, which documentation shall be in all respects materially consistent with this Term Sheet. This Term Sheet is not an offer with respect to any securities or a solicitation of acceptances of a chapter 11 plan. Any such offer or solicitation will only be made in compliance with all applicable laws.

| OVERVIEW | |
|---|---|
| **Company Entities** | Corporate Air, LLC, Steel City Aviation, LLC, Cheyenne, LLC, Schreiner Air Investments, LLC, Pittsburgh Flight Training Center, Inc., Steel City Aviation, Inc., and CAM Investments, Inc. (collectively, the "**Company Entities**" or "**Debtors**") |
| **Existing Funded Indebtedness** | The Company Entities' existing funded indebtedness consists of:<br><br>• That certain *MSPLF Credit* Agreement, dated as of December 14, 2020, (as may be amended, restated, supplemented, or otherwise modified from time to time, the "**HNB Loan Agreement**") by and between the Company Entities and Huntington National Bank in the original aggregate principal amount of $2,575,054 on account of the advances under the HNB Loan Agreement, plus accrued and unpaid interest, fees, expenses (including professional fees), disbursements, charges, claims, indemnities, and other costs and obligations (the "**Senior Obligations**") |

|  |  |
|---|---|
|  | • The certain *United States Small Business Administration Economic Injury Disaster Loan*, No. 3243527202, dated April 20, 2020, (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**SBA Loan Agreement**") by and between Corporate Air, LLC and the United States Small Business Administration (the "**SBA**") in the original aggregate principal amount of $472,934 on account of the advances under the HNB Loan Agreement, plus accrued and unpaid interest, fees, expenses (including professional fees), disbursements, charges, claims, indemnities, and other costs and obligations (the "**SBA Obligations**")<br><br>• That certain *Secured Promissory Note*, dated August 26, 2025 (the "**Prepetition Bridge Note**", with any advances made pursuant to the Prepetition Bridge Note being the "**Prepetition Bridge Loan**"), by the Company Entities in favor of the Sponsor (as defined herein) in the aggregate amount of $2,159,500 on account of on account of the Prepetition Bridge Loan, plus accrued and unpaid interest, fees, expenses (including professional fees), disbursements, charges, claims, indemnities, and other costs and obligations (the "**Prepetition Bridge Loan Obligations**"). |
| **Implementation** | The restructuring and other transactions contemplated in this RSA Term Sheet will be implemented and consummated through, among other things:<br><br>• Commencement of voluntary chapter 11 cases of the Company Entities (the "**Chapter 11 Cases**" and the date on which the Chapter 11 Cases are commenced, the "**Petition Date**") pursuant to chapter 11 of title 11 of the United States Code §101 et seq. (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Western District of Pennsylvania;<br><br>• Funding of the DIP Facility, as defined and further described herein, by Vantage AGC LLC (the "**Sponsor**"); |

Docusign Envelope ID: 3879A7A1-15EB-4616-B8C3-7FB2F1ED91ED

| | |
|---|---|
| | • Confirmation of the Debtors' chapter 11 plan, which will be in form and substance acceptable to the Sponsor in its sole discretion (the "**Plan**"), and pursuant to which, among other things, the Sponsor shall acquire substantially all of the Debtors' assets as set forth in that certain *Asset Purchase Agreement* dated as of September 12, 2025, by and among the Company Entities and the Sponsor (as may be amended and/or restated, the "**Sponsor APA**"); and<br><br>• Occurrence of the effective date of the Plan (the "**Effective Date**"). |
| **Sponsor Consent Rights** | Notwithstanding anything else set forth herein, the form and substance of the Definitive Documents (defined below) shall be reasonably acceptable to the Sponsor in its sole discretion. The Definitive Documents shall include, without limitation, all of the following: (i) the Plan (including any exhibits or supplement(s) filed with respect thereto, (ii) the Disclosure Statement (including any exhibits thereto), (iii) the RSA, (iv) the order confirming the Plan (the "**Confirmation Order**"), (v) any motion or other pleadings related to the Plan, (vi) the order of the Bankruptcy Court approving the Disclosure Statement and solicitation materials, (vii) the DIP Credit Agreement (including any amendments, modifications, or supplements thereto), (viii) any motions and related declarations filed with the Bankruptcy Court seeking approval of the DIP Credit Agreement, (ix) the interim and final DIP orders, and (x) all "first day" motions, applications, and related orders. |
| **Restructuring** | The Restructuring shall be consummated through, *inter alia*, the Sponsor's acquisition of substantially all of the Debtors' assets, including certain of the Reorganized Debtors' new common equity (the "**New Common Equity**") and certain of the Debtors' equity interests that comprise the entities as defined as FAA Seller Entities in section 1.1.6 of the Sponsor APA, each as further set forth herein, the Plan, and the Sponsor APA. The Debtors, as reorganized under the Plan, shall be referred to herein as the "**Reorganized Debtors**." |

94455760.7

| | |
|---|---|
| **Case Financing** | The Chapter 11 Cases shall be financed by:<br><br>• A postpetition subordinated debtor-in-possession term loan facility provided by the Sponsor on terms and conditions set forth herein (the "**DIP Facility**" or "**DIP Loan**"); and<br><br>• cash on hand, which shall be made available to fund operations pursuant to the terms and conditions of the DIP Credit Agreement and the Interim and Final DIP Orders. |
| **DIP Facility Terms** | The DIP Facility shall include the following terms:<br>• <u>Commitment</u>: The aggregate amount of the DIP Facility will be in accordance with the DIP Loan Documents and Approved Budget, in each case subject to the DIP Lender's approval.<br>• <u>Interest Rate</u>: 15%<br>• <u>Default Rate</u>: +5%<br>• <u>Commitment Fee</u>: 2%<br>• <u>Exit Fee</u>: None<br>• <u>Priority</u>: The DIP Facility will be junior to the Senior Obligations and the SBA Claims, but senior to all other obligations.<br>• <u>DIP Collateral</u>: All assets of the Debtors, including, subject to entry of the Final DIP Order, proceeds of Avoidance Actions.<br>• <u>Use of Proceeds</u>: Proceeds to be used for payroll, key suppliers, operations, and ongoing restructuring efforts, each as set forth in the Budget.<br>• <u>Conditions Precedent</u>: Court approval of the DIP Facility and other customary terms set forth in DIP Credit Agreement.<br>• <u>DIP Facility Equitization</u>: DIP Facility (including all accrued and unpaid interest and fees) will equitize upon the Plan Effective Date. |
| **TREATMENT OF CLAIMS AND INTERESTS** | |
| **Administrative Claims** | Claims incurred for a cost or expense of administration of the Chapter 11 Cases entitled to priority under sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code (the "**Administrative Claims**"), other than Professional Fee Claims (as defined below).<br><br>*Treatment*: Paid in full, in cash, on the Effective Date |

| | |
|---|---|
| | *Voting:* Unimpaired, not entitled to vote |
| **Professional Fee Claims** | Claim for professional services, including legal, financial, advisory, accounting, and other services, rendered or costs incurred on or after the Petition Date through the Effective Date by professional persons retained by the Debtors or any statutory committee under sections 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code, subject to the amounts set forth in the Budget (the "**Professional Fee Claims**"). <br><br> *Treatment*: Paid in full, in cash, on the Effective Date <br><br> *Voting:* Unimpaired, not entitled to vote |
| **DIP Claims** | Claims consisting of the aggregate outstanding principal amount of, plus unpaid fees and interest on, the DIP Loan (the "**DIP Claims**"). <br><br> *Treatment*: Paid in full, to equitize into New Common Equity plus acquisition of other Acquired Assets set forth in the Sponsor APA, including the FAA Entity Equity <br><br> *Voting:* Unimpaired, not entitled to vote |
| **Secured Tax Claims (if any)** | Claims consisting of the aggregate outstanding principal amount of and unpaid interest that, absent its secured status would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties (the "**Secured Tax Claims**"). <br><br> *Treatment*: Paid in full, in cash, on the Effective Date <br><br> *Voting:* Unimpaired, not entitled to vote |
| **Senior Secured Claims (Huntington Bank)** | Claims consisting of the aggregate outstanding principal amount of and unpaid interest on the Senior Obligations (the "**Senior Secured Claims**"). <br><br> *Treatment*: Paid in full, in cash, on the Effective Date <br><br> *Voting:* Unimpaired, not entitled to vote |

5

| | |
|---|---|
| **SBA Claims**<br>**(Small Business Administration)** | Claims consisting of the aggregate outstanding principal amount of and unpaid interest on the SBA Obligations (the "**SBA Claims**").<br><br>*Treatment*: Paid in full, in cash, on the Effective Date<br><br>*Voting:* Unimpaired, not entitled to vote |
| **Bridge Note Claims**<br>**(Sponsor)** | Claims consisting of the aggregate outstanding principal amount of and unpaid interest on the Prepetition Bridge Loan Obligations (the "**Bridge Note Claims**").<br><br>*Treatment*: Convert into remaining New Common Equity, or cash in an amount equal to such New Common Equity<br><br>*Voting:* Impaired, entitled to vote |
| **Other Secured Claims** | Secured claims, other than Senior Secured Claims, SBA Claims, and Bridge Note Claims (the "**Other Secured Claims**").<br><br>*Treatment*: Paid in full, in cash, on the Effective Date<br><br>*Voting:* Unimpaired, not entitled to vote |
| **Priority Tax Claims** | Claims of governmental units entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (the "**Priority Tax Claims**").<br><br>*Treatment*: Paid in full, in cash, on the Effective Date, or such other treatment permissible under the Bankruptcy Code.<br><br>*Voting:* Unimpaired, not entitled to vote |
| **Other Non-Tax Priority Claims** | Any Claim other than an Administrative Claim, DIP Claim, or Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code (the "**Other Priority Claims**").<br><br>*Treatment*: Paid in full, in cash, on the Effective Date<br><br>*Voting:* Unimpaired, not entitled to vote |

94455760.7

| General Unsecured Claims | Claims consisting of any prepetition claim against the Company Entities that is not an Administrative Claim, a DIP Claim, a Professional Fee Claim, a Senior Secured Claim, SBA Claim, a Bridge Note Claim, an Other Secured Claim, a Priority Tax Claim, or an Other Priority Claim (the **General Unsecured Claims**"). The General Unsecured Claims shall be treated as one class of claims for all purposes of the Plan.<br><br>*Treatment:* General Unsecured Claims will receive their *pro rata* share of the GUC Fund, *provided that* the class votes in favor of the Plan. If the class does not vote in favor of the Plan, holders of General Unsecured Claims will not receive any recovery.<br><br>*Voting*: Impaired entitled to vote. |
|---|---|
| Equity Interests | Any Interests in the Debtors represented by ownership of common or preferred stock, including, to the extent provided by applicable law, any purchase right, warrant, stock option or other equity or debt security (convertible or otherwise) evidencing or creating any right or obligation to acquire or issue any of the foregoing.<br><br>*Treatment*: Holders of Equity Interests shall not receive any distribution under the Plan, and Equity Interests shall be extinguished.<br><br>*Voting*: Impaired, deemed to reject, not entitled to vote. |
| **OTHER MATERIAL PROVISIONS** | |
| Release, Injunction, Exculpation | The Plan will contain standard estate and consensual third-party releases, injunction provisions, and exculpation provisions for the benefit of the Company Entities, the Sponsor, the DIP Lender, and each of their related parties, as broad as permissible under applicable law. |

| Executory Contracts and Leases | All executory contracts and unexpired leases shall be rejected as of the Effective Date, unless determined to be assumed by the Sponsor in its sole discretion. |
| --- | --- |
| Corporate Governance | Member managed limited liability company |
| Indemnification | The Plan shall provide that all indemnification obligations currently in place (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Company Entities, as applicable, shall be assumed or assumed and assigned and remain in full force and effect after the Effective Date, and shall survive unimpaired and unaffected, irrespective of when such obligation arose, as applicable. To the extent necessary, the governance documents adopted as of the Effective Date shall include provisions to give effect to the foregoing. |
| Conditions Precedent to the Effective Date | The following shall be conditions precedent to the Effective Date, unless waived by the Company Entities and the Sponsor: <ul><li>The Bankruptcy Court shall have entered the Confirmation Order and such order shall be (A) in form and substance consistent with the RSA and the RSA Term Sheet, or otherwise acceptable to the Sponsor in its sole discretion, and (B) shall not have been vacated and shall not be stayed pending appeal;</li><li>The Definitive Documents shall (A) have been executed and effectuated and remain in full force and effect, (B) be in form and substance acceptable to the Sponsor in its sole discretion, and (C) be consistent with the RSA and the RSA Term Sheet, and any conditions precedent related thereto or contained therein shall have been satisfied before or contemporaneously with the occurrence of the Effective Date or otherwise waived;</li><li>All governmental and third-party approvals, authorizations, rulings, documents, and consents that may be necessary in connection with the</li></ul> |

8

Docusign Envelope ID: 3879A7A1-15EB-4C46-B8C3-7FB2F1ED91ED

| | |
|---|---|
| | Restructuring and related transactions, shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on the Restructuring and related transactions;<br><br>• No court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, limiting, preventing, or prohibiting the consummation of the Restructuring or any related transactions;<br><br>• The RSA shall be in full force and effect, no Termination Event or event that would give rise to a Termination Event under the RSA upon the expiration of the applicable grace period shall have occurred, and the RSA shall not have been validly terminated before the Effective Date;<br><br>• The releases and exculpation consistent with the terms of this RSA Term Sheet shall have been approved; and<br><br>• All of the Sponsor's reasonable and documented fees and expenses payable under the RSA shall have been paid in full.<br><br>• The Debtors shall have obtained final orders invalidating/avoiding any purported secured liens/claims other than those that were stipulated to by the Debtors under the DIP Orders.<br><br>• All liabilities arising from priority claims under section 507 of the Bankruptcy Code shall not exceed $1,000,000 in the aggregate.<br><br>• The amount of Allowed Professional Fee Claims to be paid under the Plan shall be no more than the amounts set forth in the Approved Budget. |
| **Case Milestones** | The Sponsor's support for the Restructuring shall be subject to the timely satisfaction of the following milestones which may be waived or extended with the prior written consent of the Sponsor in its sole discretion:<br><br>• Petition Date shall be no later than September 29, 2025; |

<table>
<tr><td></td><td>

- no later than 3 calendar days following the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

- no later than 3 business days after the Petition Date, file a motion establishing a bar date;

- no later than 10 calendar days following the Petition Date, the Debtors shall have filed (i) a Plan acceptable to the Sponsor; (ii) a Disclosure Statement acceptable to the Sponsor; and (iii) a motion seeking entry of an order approving a Disclosure Statement acceptable to the Sponsor;

- no later than 30 calendar days following the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

- no later than 40 calendar days following the Petition Date, the Bankruptcy Court shall have entered an order approving the Disclosure Statement;

- no later than 75 calendar days following the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and

- no later than 90 calendar days following the Petition Date, the Plan Effective Date shall have occurred.

</td></tr>
</table>

| **Fees and Expenses** | The Company will be responsible for and pay all fees and expenses incurred by the Sponsors in connection with the Restructuring, including attorneys' fees and expenses. |
| --- | --- |
| **Tax Structure** | To the extent practicable, the Restructuring contemplated by this RSA Term Sheet will be structured so as to obtain the most beneficial structure for the Company, as agreed to by the Company and the Sponsor. |
| **Confidentiality** | The Parties hereby acknowledge and agree that the existence of this RSA Term Sheet, and the terms and provisions hereof, are governed by mutual agreement with respect to confidentiality and subsequent oral and electronic communications. |

94455760.7

*Execution Version*

## **Exhibit B**

Form of Joinder Agreement

This Joinder to the Restructuring Support Agreement, dated as of September 28, 2025, by the Company and the Sponsor (the "**Agreement**"), is executed and delivered by [                    ] (the "**Joining Party**") as of [                    ], 2025 in connection with the transfer from a Sponsor party to the Agreement to the Joining Party. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement.

1.      <u>Agreement to be Bound</u>. The Joining Party hereby agrees to be bound by all of the terms of the Agreement, which is attached to this Joinder as <u>Annex I</u> (as the same may be hereafter amended, restated, or otherwise modified from time to time) as if the Joining Party were an original signatory to the Agreement. From and after the date hereof, the Joining Party shall hereafter be deemed to be a "**Sponsor**" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

2.      <u>Representations and Warranties</u>. With respect to the amount of Sponsor Claims set forth below its name on the signature page hereof and all related claims, rights, and causes of action arising out of or in connection with or otherwise relating to such Claim, the Joining Party hereby makes the representations and warranties of such Sponsor party set forth in the "Ownership of Claims" and "Representations" section of the Agreement to each other Party to the Agreement.

3.      <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in the United States District Court for the Southern District of New York, and by execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[JOINING PARTY]**

By: _____
Name: _____
Title: _____

<u>Aggregate Principal Amount Sponsor Claims</u>:

$_____

11723763.v2